## ST. PAUL, S. & T. F. RY. Co. *v.* SAGE.

*(Circuit Court of Appeals, Eighth Circuit.* February 1, 1892.)

1. FEDERAL COURTS—STATE STATUTES OF LIMITATION—RAILROAD GRANT LANDS.
   In a suit in equity between two Minnesota corporations, to determine conflicting claims to land under grants from congress, the federal court will recognize and apply the state statute of limitations.

2. LIMITATION OF ACTIONS—LEGAL FRAUD.
   Gen. St. Minn. c. 66, § 6, subd. 6, providing a six-years limitation in actions for relief on the ground of fraud, and that the cause of action shall not be deemed to accrue until the discovery of the fraud, applies to an action based upon the legal fraud involved in the refusal of a person who has become invested with the legal title to lands to convey the same to the real owner, or to account to him for the proceeds thereof in case the lands have been sold.

3. SAME—DISCOVERY OF FRAUD.
   In such case the bar of the statute cannot be avoided on the ground of delay in discovering the fraud by a land-grant railroad company with respect to lands lying within its place limits which have been selected as indemnity lands by another land-grant company, and have been certified to the state as such, and by it conveyed to the company; since all these proceedings were necessarily matters of public record, which it was inexcusable neglect not to discover.

4. LACHES.
   Independently of the statute of limitations it was laches for the complainant company to delay the assertion of its title for 14 years after the conveyance of the lands to the defendant company, during which period the lands were sold by defendant to settlers, whose title is necessarily clouded by the present proceedings.

5. SAME.
   The fact that under the bill, instead of a recovery of the lands, a money judgment could be had for the proceeds of their sale, does not affect the question of laches, it appearing that such proceeds have been used in paying defendant's debts, and that a judgment for the amount thereof would greatly depreciate the value of defendant's bonds and stock-shares, many of which have doubtless passed into the hands of innocent holders.

   44 Fed. Rep. 817, and 32 Fed. Rep. 821, reversed.

Appeal from Circuit Court of the United States for the District of Minnesota.

Bill originally brought by the Hastings & Dakota Railway Company against the Stillwater & Taylor's Falls Railway Company to recover certain lands, or to have an accounting for the money realized therefrom. Russell Sage, having purchased all the title and interest of complainant since the commencement of the suit, was substituted as plaintiff. Decree for complainant, (32 Fed. Rep. 821,) which was affirmed on rehearing, (44 Fed. Rep. 817.) Defendant appeals. Reversed.

*Thomas Wilson* and *Lloyd W. Bowers,* for appellant.

*John M. Gilman, Frank B. Kellogg, Owen Morris,* and *Britton & Gray,* for appellee.

Before CALDWELL, Circuit Judge, and SHIRAS and THAYER, District Judges.

SHIRAS, District Judge. By an act of congress, approved March 3, 1857, there was granted to the then territory of Minnesota, for the purpose of aiding in the construction of a line of railway from Stillwater, by way of St. Paul and St. Anthony, to a point between the foot of Big Stone lake and the mouth of Sioux Wood river, with a branch by way of St. Cloud and Crow Wing to the Red River of the North, every

alternate section of land designated by odd numbers for six sections on each side of said named lines of railroad; it being further provided that if it should appear, when said lines of railway were definitely fixed, that the United States had sold any of the granted sections or parts thereof, or that the right of pre-emption had attached thereto, then selections of indemnity lands might be made by agents of the territory, subject to the approval of the secretary of the interior, from the odd-numbered sections lying nearest to the six-mile limit, and within a limit of 15 miles from the line of said railways. By the act of March 3, 1865, the place limits as defined in the act of 1857 were extended to 10 sections per mile, and the indemnity limits to 20 miles on each side of the railroads named in the act.

The territory of Minnesota, by an act of its legislature, approved May 22, 1857, accepted the grant for the purposes named, and authorized the Minnesota & Pacific Railroad Company to construct the designated lines of railway, and by various transfers and other proceedings, not necessary to be detailed, the St. Paul, Stillwater & Taylor's Falls Railway Company has become the beneficiary under said grant, and entitled to all the lands and the proceeds thereof passing by the terms thereof, by reason of the construction of the named line of railway, by way of St. Paul and St. Anthony, to a point between the foot of Big Stone lake and the mouth of Sioux Wood river. By an act of congress, approved July 4, 1866, a further grant of land was made to the state of Minnesota, to aid in the construction of a line of railway from the town of Hastings, through the counties of Dakota, Scott, Carver, and McLeod, to a point on the western boundary of the state to be designated by the legislature; the grant covering the odd-numbered sections for 10 miles on each side of the named line of railway, with the right to select indemnity lands within a limit of 20 miles. The state of Minnesota accepted this grant by an act of the state legislature, approved March 4, 1867, and authorized the Hastings & Dakota Railway Company to construct the designated line of railway, and to thereby become the beneficiary of the congressional grant contained in the act of 1866, and that company has, by the construction of the road, become entitled to the benefit of the grant in question. On the 19th of December, 1871, the secretary of the interior certified to the state of Minnesota, and the state, on the 19th of February, 1872, conveyed to the St. Paul, Stillwater & Taylor's Falls Railway Company, some 20,807 acres of land as part of the indemnity lands belonging to that company, all of which lands are situated without the primary or place limits of the grants under which that company claims title, but within the indemnity limits thereof as enlarged by the amendatory act of March 3, 1865; or, in other words, the same are more than 15 but less than 20 miles from the line of railway constructed and operated by that company, and they are within 10 miles of the line of railway constructed and operated by the Hastings & Dakota Company.

On the 26th day of January, 1886, there was filed in the United States circuit court for the district of Minnesota by the Hastings & Da-

kota Railway Company a bill in equity, in which it was averred that the complainant was the real owner of the 20,807 acres of land above named; that the same had been wrongfully certified and conveyed to the St. Paul, Stillwater & Taylor's Falls Railway Company; that by the terms of the act of congress of July 4, 1866, and the location of the line of railway, and the filing of the map showing such location, the equitable right and title to said lands had passed to the complainant company before said lands had been selected and certified as indemnity lands for the benefit of the St. Paul, Stillwater & Taylor's Falls Company, which was made the defendant to the bill, and a decree was prayed to the effect that the defendant be decreed to hold all said lands, and the legal title thereof, in trust for complainant, and to convey the same, or that the title thereto be passed to complainant, as provided by the statutes of the state of Minnesota, and for other and further relief. On the 9th day of June, 1887, an amendment was filed to the bill, in which it was averred that the defendant company had sold, mortgaged, and otherwise disposed of certain portions of the lands in question, and it was therefore prayed that, in addition to the relief originally asked, the defendant be required to account for all lands sold, mortgaged, or disposed of, and to pay the proceeds thereof to complainant. The defendant company answered the bill upon the merits, and the cause was duly submitted, upon the pleadings and proofs, and thereupon a decree was entered, adjudging that the complainant company had the equitable title to the lands described in the bill; that the defendant company be perpetually enjoined from asserting any claim or title thereto, and be required to convey such portion thereof as had not been previously sold or disposed of to the complainant within 30 days after the confirmation of the master's report, and the case was ordered to be referred to a master, for him to ascertain and report the number of acres of the lands that had been sold or disposed of by the defendant company, with the amounts realized by such sales, together with a statement of the expenses and outlay made or incurred by the defendant in reference to or on account of said lands. It appearing by a stipulation signed on behalf of each party, and filed on the 17th day of March, 1891, that the Hastings & Dakota Railway Company had, since the commencement of the suit, sold and assigned all its title and interest in the lands in controversy to Russell Sage, it was ordered by the court that he be substituted as complainant in the cause.

The report of the master having been filed, thereupon the defendant company moved for and obtained an order for a rehearing of the cause upon its merits, and also obtained leave to amend the answer in the cause, by pleading, as an additional defense, the statute of limitations enacted by the legislature of the state of Minnesota, averring as the basis thereof that the lands in dispute had been certified by the secretary of the interior to the state for the benefit of defendant, and had been by the state deeded to defendant, and the deeds entered upon the public records, more than six years before the bringing of this suit. Upon the rehearing the court held adversely to the plea of the statute of limita-

tions, and in favor of the complainant upon the other issues; and, it appearing from the report of the master that all the lands named in the bill had been sold or disposed of by the defendant company, and that the amount realized therefrom, including interest, and deducting the expenses and the outlay incurred by defendant in connection with said lands, was the sum of $211,536.35, a decree ordering the payment thereof by the defendant company was duly entered. To reverse this decree the defendant company perfected an appeal to this court, and counsel for the respective parties have very fully and ably discussed the questions of law and facts involved in the controversy.

We propose to first consider the questions arising upon the plea of the state statute of limitations, the overruling of which is assigned as error. On behalf of the complainant it is argued that when courts of the United States, sitting in equity, are called upon to determine and enforce rights arising under acts of·congress, the provisions of a state statute of limitations cannot be made applicable thereto. Where rights to property are created by acts of congress, and the procedure for enforcing or protecting the same is likewise created by congressional action, and the jurisdiction is conferred exclusively upon the federal courts, as in matters pertaining to patents, and the like, then it may well be claimed that state statutes of limitation do not apply thereto; but in cases wherein the jurisdiction over the subject-matter of controversy is concurrent in the state and federal courts, why should not force be given to the state statute in both courts? In England the statute was originally applicable only to actions at law, but courts of equity, in all cases of concurrent jurisdiction, gave full effect to the provisions of the statute, acting, as it was said, by way of analogy; but by the act of 3 and 4 Wm. IV. suits in equity were brought within the express provisions of the statute. In Minnesota the statute in terms is applicable to proceedings at law and in equity, and is therefore binding upon the state courts, without regard to the nature of the jurisdiction that is being exercised in the given case, or, as is said by the supreme court in *Godden* v. *Kimmell*, 99 U. S. 201:

"Statutes of limitation form part of the legislation of every government, and are everywhere regarded as conducive, and even necessary, to the peace and repose of society. When they are addressed to courts of equity as well as courts of law, as they seem to be.in controversies of concurrent jurisdiction, they are equally obligatory in both forums as a means of promoting uniformity of decision."

The general question under consideration is quite fully discussed by Mr. Justice HARLAN in delivering the opinion of the court in *Kirby* v. *Railroad Co.*, 120 U. S. 130, 7 Sup. Ct. Rep. 430, in which it is held that the jurisdiction in equity conferred upon the courts of the United States cannot be impaired or impeded in execution by state statutes of limitation, and particularly in cases solely of equitable cognizance; that in cases of concurrent legal and equitable jurisdiction, subject to the rule of carefully preserving the equitable jurisdiction of the federal courts unimpaired, the court of equity is bound to enforce the state statute of limitations, and in cases of equitable cognizance solely the court will, by

way of analogy, apply the provisions of the state statute applicable to the subject-matter of the controversy, and thus give effect to the salutary principle underlying these statutes of repose. In applying these principles to the facts of the particular case then under consideration, the court held that it would not, the case being in equity, apply a provision of a state statute that would bar relief in equity against an actual secret fraud in a given number of years from the perpetration of the act of fraud, but would apply the limitation in accordance with the equitable principle recognized in the federal courts; that the bar caused by the lapse of time should not begin to run until the discovery of the fraud by the one aggrieved thereby, or the equivalent of such discovery. It appearing, however, that nearly seven years had elapsed after the discovery of the fraud, the court held that the limitation of six years provided in the statutes of New York, from which state the cause came to the supreme court, was a bar to the proceeding.

In *Wood* v. *Carpenter*, 101 U. S. 135, will be found a very instructive discussion of what is required in the way of pleading and proof, when it is sought to avoid the bar of the statute on the ground of lack of knowledge of the alleged fraud. It is therein said:

"Statutes of limitation are vital to the welfare of society, and are favored in the law. They are found and approved in all systems of enlightened jurisprudence. They promote repose by giving security and stability to human affairs. An important public policy lies at their foundation. They stimulate to activity, and punish negligence. While time is constantly destroying the evidence of rights, they supply its place by a presumption which renders proof unnecessary. Mere delay extending to the limit prescribed is itself a conclusive bar. The bane and the antidote go together."

The court then proceeds to show that the principle that the bar of the statute, in cases of fraud, is not usually held to begin to run until the discovery of the fraud, is a rule originally established by courts of equity, and thence imported into the statutes; that a party who seeks to avoid the plea of the statute is bound by stringent rules of pleading and evidence; that there must be distinct averments as to the time when the fraud, misrepresentation, or concealment was discovered, and the nature thereof, so that the court may see whether, by ordinary diligence, an earlier discovery might not have been made; that a general allegation of ignorance at one time, and of knowledge at another, are of no effect; that a party seeking to avoid the bar of the statute on account of fraud must aver and show that he used due diligence to detect it, and, if he had the means of knowledge or discovery in his power, he will be deemed to know all that, with ordinary care, he might have obtained knowledge of; that the fraud which will arrest the running of the statute must be one that is secret and concealed, and not one that is open and known.

In *Bicknell* v. *Comstock*, 113 U. S. 149, 5 Sup. Ct. Rep. 399, it appeared that an action for the breach of the covenants of warranty in a conveyance of lands in Iowa was brought in the United States circuit court for the eastern district of New York; it being claimed that the su-

perior title was in the state of Iowa under a congressional grant to that state.   It appeared in the cause that in May, 1869, a patent in due form had been issued, conveying the land to Bicknell, which patent was forwarded to the local land-office at Fort Dodge, Iowa, for delivery to Bicknell.   In June, 1878, the commissioner of the general land-office ordered the patent to be returned to his office, and on its reception he tore off the signature of the president, and erased the record of the patent in the general land-office.   It was pleaded in the case that Bicknell and his grantees had been in the actual possession of the premises since May 23, 1862, and had made valuable improvements on the land.   The supreme court held that, without deciding whether the patent conveyed a valid title or not, Bicknell and his grantees were in possession under claim and color of title, and that the provisions of the Iowa statute, making 10 years' possession a bar, was applicable to the case, regardless of whether the suit was at law or in equity, citing, in support of the ruling, the cases of *Leffingwell* v. *Warren*, 2 Black, 599; *Croxall* v. *Sherrerd*, 5 Wall. 289; *Dickerson* v. *Colgrove*, 100 U. S. 583.   These citations are sufficient to show, as is said in *Leffingwell* v. *Warren*, *supra*, "that the courts of the United States, in the absence of legislation upon the subject by congress, recognize the statutes of limitation of the several states, and give them the same construction and effect which are given by the local tribunals."   There is nothing in the subject-matter of the controversy now before the court that takes the case out of the general rules thus enunciated by the supreme court.   The land described in the bill is situated in the state of Minnesota.   The original parties to the litigation are both corporations created under the laws of that state.   The question in dispute between them is, which party is the owner of the land; and, while the settlement of that question involves, among other matters, the construction of the several acts of congress making grants to the state of Minnesota to aid in the construction of certain lines of railway, that fact does not make the litigation solely and exclusively of federal jurisdiction.   This proceeding to settle the rights of the respective parties to these lands could have been brought in the proper court of the state of Minnesota, and its jurisdiction to hear and determine all questions arising in the case would have been beyond dispute.   If the suit had been thus brought in the state court, can it be doubted that it would have been the duty of that court to give full force to the state statute of limitations, had the same been pleaded in the case?   If any of the provisions of the statute—a statute wisely enacted to give stability to titles, thereby promoting confidence, and encouraging the improvement of the lands of the state, and intended to prevent the evil of parties waiting until by lapse of time valuable evidence may be rendered difficult of procurement or wholly unattainable, and then preferring doubtful and speculative claims—would have barred the suit if brought in the state court, why should not the same bar be effectual when the proceeding is in the federal court?   Upon both principle and authority we are of the opinion that the case is one in which the federal court, sitting in equity,

should give the same force and efficacy to the provisions of the state statute that would be given thereto if the cause was pending before a court of the state of Minnesota.

In the state statute are to be found two clauses which it is claimed have relation to a suit of this character, being subdivisions 6 and 7 of section 6, c. 66, tit. 2, of the General Statutes of Minnesota, the limit of time applicable to each being six years. These clauses read as follows:

"*Sixth.* An action for relief on the ground of fraud; the cause of action in such case is not to be deemed to have accrued until the discovery by the aggrieved party of the facts constituting the fraud.

"*Seventh.* Actions to enforce a trust or to compel an accounting where the trustee has neglected to discharge his trust, or has repudiated the trust relation, or has fully performed the same."

In the absence of an authoritative construction of these clauses of the statute by the supreme court of Minnesota, we should be of the opinion that the proceeding now before the court comes within the sixth subdivision above cited. That subdivision covers actions for relief on the ground of fraud; and, as the statute is undeniably intended to include proceedings at law and in equity, it may well be argued that the clause includes not only such actual frauds as may form the basis for actions at law, but also all such transactions as a court of equity will adjudge to be frauds, actual or constructive; thus including cases wherein a party, having become vested with the title of property rightfully belonging to another, refuses to convey the same to the real owner, or to account to him for the value thereof, in case the same has been sold and the money appropriated by the one not entitled thereto, which withholding of the property or its proceeds would be deemed to be a fraud upon the rights of the real owner. The seventh subdivision, covering actions to enforce a trust or to compel an accounting where a trustee has neglected his duty or has repudiated the trust relation, would seem to be limited to trusts express, implied, or resulting, growing out of the agreements of parties, or out of the duties and obligations pertaining to some relation of trust assumed by the one charged as a trustee, and does not include purely constructive trusts of the character of that charged against the defendant in this proceeding. This is clearly indicated by the terms used to describe the derelictions of the trustee, which may form the basis of the action, intended to be included within this subdivision, to-wit, "where the trustee has neglected to discharge his trust, or has repudiated the trust relation, or has fully performed the same." This phraseology is entirely apt when applied to cases wherein an actual trusteeship exists, and the trustee neglects the duty assumed by him, or, after assuming the position, then repudiates the trust relation, or closes up the trust, but fails to properly account for his stewardship, but it is only by a strained construction of the terms that they can be made applicable to constructive trusts that are imposed by the law, contrary to the will of the one held to account. It is, however, claimed by the defendant that the supreme court of Minnesota, in the case of *Burk* v. *Association*, 40

Minn. 506, 42 N. W. Rep. 479, has expressly ruled that a case similar to that now before the court, wherein it was sought to have the defendant adjudged a trustee of the legal title for the benefit of the plaintiff, was governed by the seventh subdivision above cited, and it is not to be denied that the *opinion does so state.* The case is very briefly reported, and in view of the language used in other decisions by the same court, including that in the case of *Lewis* v. *Welch,* decided in April last, and reported in 48 N. W. Rep. 608, it is not entirely clear that the supreme court of Minnesota, whose construction of the statute is, of course, binding upon us, intends to be understood as ruling that cases like the present do not come under the sixth, but only under the seventh, subdivision of section 6 of the statute. If it be held that the seventh subdivision is the clause applicable to the proceeding, then it follows that the bar of the statute is made out, for it is not disputed that the lands were deeded to the defendant company in 1871, and that company has ever since that date claimed to be the owner of the lands, so that more than six years had elapsed since the defendant received the title before the present suit was brought.

The same result follows, if it be held that the case falls within the provisions of subdivision 6 of the statute. In that event, the ruling in *Wood* v. *Carpenter,* already cited, would be applicable, and it would be incumbent upon complainant, in order to avoid the bar created by the lapse of six years since the vesting of the title in the defendant company, to show clearly when discovery of the fact was made, and that the company was not in fault in not obtaining such knowledge at an earlier day. The fraud sought to be charged upon the defendant is not an actual fraud, nor is it one which was in any way concealed or kept secret. The facts show that both companies were claiming these lands. Every step taken by the defendant was, of necessity, made openly and above board. The lands were selected as indemnity lands, belonging to the defendant, and the governor of the state asked in due form that they be so certified. They were certified to the state, and by the state were deeded to the defendant. These deeds were entered of record in the counties wherein the lands are situated, and in fact every step taken in procuring the same was made part of the public records of the federal and state land departments, which were open to the scrutiny of the public. The lands were offered for sale and sold to various purchasers, who entered into actual and open possession of the premises, and thus notice in every possible way was given to all the world that the defendant claimed the land, with full right to sell and dispose of the same.

In view of the facts disclosed upon this record, it cannot be held that the complainant can escape the bar provided in the sixth subdivision on the ground that it did not discover the facts of the alleged fraud, for, if it was ignorant of the fact of the transfer of the title of these lands to the defendant, it must have been willfully ignorant, in that it had before it the means of knowledge, and it is not claimed that the defendant practiced any concealment in the premises. The plea that was filed on behalf of the defendant was, in effect, that six years and more had elapsed

since the title of the lands had been conveyed to it, and therefore the action was barred by lapse of time. According to the ruling of the United States supreme court in *Wood* v. *Carpenter, supra,* if the complainant desired to escape the bar by reason of the fact that relief was sought against fraud not discovered until a time within the six years, then it was the duty of the complainant, by proper allegations and proof, to show the existence of actual fraud, concealed from the knowledge of complainant, and, without fault on its part, not discovered until within the six years before the bringing of the suit; and under the ruling of the supreme court of Minnesota in *Burk* v. *Association, supra,* if there were any facts excusing the delay, the complainant should have pleaded and proved the same. The bill on its face expressly avers that the lands in dispute were selected by the agents appointed by the governor of the state, with the approval of the secretary of the interior, and were certified to the state in aid of, and for the benefit of, the St. Paul & Pacific Company, the predecessor of the defendant company, on the 11th day of October, 1871, and it is not averred that the complainant or its predecessors had not knowledge of this fact. When the plea of the statute was filed, it was open to complainant to meet it by the averment of any and all facts which would avoid the running of the statute, if any such existed, but no amended or supplemental bill or amendment thereto was filed, and there is, therefore, upon the face of the pleadings nothing to the contrary of the fact that complainant and all its predecessors had full knowledge of all the transfers of the lands in dispute at the time the same were made.

The evidence also shows that the entire line of complainant's road was completed by December, 1879, more than six years before this suit was brought.

Reliance is placed, in argument, upon the testimony of George E. Skinner and W. H. Kelly, who were land commissioners of the complainant company, that they or the company did not have notice of the transfer of these lands to the defendant until in 1883. While these witnesses do in general terms so testify, they wholly fail to explain why they, or the company they represented, did not take interest enough in the matter to make any inquiry about these lands, or to obtain knowledge of their condition in regard to title or occupancy. It does not seem possible that no examination or inquiry in regard to these lands was ever made on behalf of the complainant company for nearly four years after the whole line of road was completed, and for seventeen years after they were granted to the company, according to the present contention. The means of knowledge on part of the complainant were too open and available for it to be credible that the company allowed a period of seventeen years to elapse after the date of the grant under which it claims, and four years after it had earned all it could under the grant, before any inquiry touching these lands was made in the interest of the company, and even the slightest inquiry or examination would have disclosed the fact that the state and United States authorities had selected and conveyed these lands to the defendant company, deeming that company to be en-

titled thereto. If, however, it be true that the complainant did not obtain knowledge of this fact until in 1883, as is now claimed, then such want of knowledge was due solely to the inexcusable negligence of the complainant, and ignorance due to negligence cannot be urged as a ground why the bar of the statute should not prevail. ·

Furthermore, even if it should appear that through any fault in pleading or otherwise the defense based upon the plea of the statute of limitations had not been technically made out, or if there was no provision in the statute properly applicable to proceedings of this nature, we deem it to be a case wherein the long and unexplained delay in bringing the suit requires the court to hold that the claim has, through the laches of complainant and his assignor, become a stale demand, and one which a court of equity will not enforce. The rule that laches will defeat a claim which, if promptly pressed, would have been recognized and protected by a court of equity, is so well settled that it is hardly necessary to cite authorities in support thereof. See, however, *Wagner* v. *Baird*, 7 How. 234; *Hume* v. *Beal's Ex'r*, 17 Wall. 336; *Marsh* v. *Whitmore*, 21 Wall. 178; *Sullivan* v. *Railroad Co.*, 94 U. S. 806; *Lansdale* v. *Smith*, 106 U. S. 391, 1 Sup. Ct. Rep. 350; *Speidel* v. *Henrici*, 120 U. S. 377, 7 Sup. Ct. Rep. 610; *Mackall* v. *Casilear*, 137 U. S. 556, 11 Sup. Ct. Rep. 178; *Boone Co.* v. *Railroad Co.*, 139 U. S. 684, 11 Sup. Ct. Rep. 687.

The admitted facts of the case are these: The grant of the lands under which the complainant claims, was made July 4, 1866, to the state, and on the 7th of March, 1867, the Hastings & Dakota Railway Company was designated as the beneficiary of the grant by action of the state legislature. On the 26th of June, 1867, the company filed its map of definite location of the line of railway in the general land-office, and now asserts that from that date its rights had attached to the lands in dispute, or that the same were from that date withdrawn from the operation of any grant or other disposition under the laws of the United States. The line of railway of the Hastings & Dakota Company was completed by the lands in dispute in 1879. The selection and conveyance of the lands to the defendant company was made in October, 1871, and the present bill was filed January 26, 1886.

Even if it be true, as claimed by complainant, that until the final completion of the road the Hastings & Dakota Company could not maintain a bill to compel the transfer of the legal title to it, yet it is entirely clear that, upon the conveyance of the land to the defendant company in 1871, the Hastings & Dakota Company could have maintained a bill in equity enjoining that company from selling or incumbering the property until the final determination of the question of the rightful ownership of the lands. No such action was taken. The Hastings & Dakota Company, so far as it appears, remained supinely inactive, and permitted the state authorities to select the lands as indemnity lands belonging to the defendant company, and to petition the secretary of the interior to certify them to the state for the benefit of the defendant company, and upon their certification to the state permitted the state to deed them to the defendant company without objection or protest. Grant the conten-

tion of the complainant, that there was no appropriate legal remedy open to the railway company until the lands had been deeded to the defendant, what excuse is there for the delay of over 14 years that intervened between the time the lands were deeded to the defendant company and the bringing of the present suit, during which period the courts of equity were open for the assertion and protection of whatever rights and equities belonged to the complainant company.

It is urged in argument that it does not appear that the lapse of time has put the defendant company or any one else at a disadvantage, and therefore there is no ground for applying the doctrine of laches. The lapse of time is almost certain to affect the evidence upon which the legal rights of the parties are dependent, and this is a sufficient reason for requiring diligence at the hands of a suitor in equity in all cases wherein it appears that delay may have put a party to a disadvantage in the procurement of material evidence. The record of this case discloses the fact that one of the main points in controversy is in regard to the extent of the withdrawal of lands ordered by the commissioner of the general land-office, in letters addressed to the local land-officers in Minnesota, dated July 10, 1865, and containing diagrams of the line of the railway opposite to which the ultimate sections were ordered withdrawn. These diagrams and other like matters are not in evidence, having, it would seem, become lost or mislaid. But, aside from considerations of this nature, it is clearly apparent that the money interest of the defendant, and others holding under it, would be disastrously affected by entertaining the present bill at this late date. In the first instance, it is averred in the amendment to complainant's bill that after the lands had been conveyed to the defendant company it executed a mortgage thereon, and it appears from the evidence that the bonds secured by such mortgage were sold for the purpose of raising money to aid in building the railway owned by the defendant. The bill, as amended, prays the court to adjudge the lands to be the property of complainant, the defendant to be a trustee holding the title for complainant; and certainly, from the moment this bill was filed, the security of the mortgage executed by the defendant company has been affected, and the value of the bonds secured thereby has been depreciated.

Furthermore, if the defendant company is now required to pay the sum adjudged against it, the loss caused thereby will fall upon the present stockholders, none of whom may have been benefited by the sale of the lands made in years past. The court cannot ignore the fact that the stock and bonds of corporations like the defendant are constantly changing hands, and that it is entirely possible that the present stockholders, when they purchased their stock, paid a larger price therefor by reason of the fact that the defendant then appeared to be the owner of the lands in controversy; and certainly, if the large sum now claimed is assessed against the company, the loss caused to the stockholders, and bondholders as well, in the necessary depreciation of the value of their securities, will be certain and great. As is said by the supreme court in *Graham* v. *Railroad Co.*, 118 U. S. 161, 6 Sup. Ct. Rep. 1009, a case wherein a bill was filed for relief against fraud in the giving and foreclosure of a

railroad mortgage, the bill being filed within fourteen years after the giving of the mortgage and seven years after the foreclosure thereof:

"During all this time the records of the courts, upon which appear all the proceedings by which the alleged fraud is claimed to have been consummated, have been open to inspection and examination, and what has been done under them might have been known to the plaintiff if he had seen fit to make inquiry. In the mean time, it is apparent that many persons must have acquired rights in the stock of the new corporation who were ignorant of the alleged frauds. Under such circumstances, to set aside this mortgage, and to disregard the decree of foreclosure, * * * is a proposition so wild and preposterous as hardly to merit serious consideration."

If, however, the court should give consideration only to the effects of the proceeding upon the defendant company, there is ample ground therein to sustain the defense of laches. The decree appealed from gives judgment for the sum of $211,536.35, and awards execution for the collection thereof. It appears from the evidence that, as the lands were sold the proceeds realized were used in paying the debts of the company, and no part thereof is now under the control of the company. There is included in the sum awarded complainant a large amount of interest, and if the decree is affirmed the company will be compelled to meet a demand for a sum largely over $200,000, or by failure to pay the same submit to a levy of execution on its property. It certainly needs no extended argument to show that it is entirely possible that the affirmance of the decree might cause the insolvency of the company, or at least it might greatly cripple and embarrass it. In view of the possible consequence to the company alone, it is certainly the duty of the court to require that the equity of complainant be made clear in all essential points, including that of diligence, before the court will move in its behalf.

But, aside from all considerations of the effect upon the defendant company, its stockholders and bondholders, of entertaining the present bill, there are other and more persuasive grounds for holding that the relief sought should not be granted at this late day. The equitable rule that one who is negligent shall not have relief, and the barring of proceedings after the lapse of stated periods of time by statutory enactments, are alike based upon public policy, as well as upon considerations affecting only individual rights. It is to the public interest that stability in the title to property should exist, and that all uncertainties and disputes as to the ownership of land should be speedily put at rest. No greater evil to the community at large can well be imagined than that caused by attacks upon the title to large bodies of land which have been for years in the actual possession of *bona fide* settlers, thus weakening the public confidence in the recognized and established evidences of title. It is greatly to the welfare of the community that realty shall be improved to the best advantage, and rendered as productive as possible, and yet these results cannot be expected if the parties in possession are in doubt whether if they sow they will be permitted to reap the harvest. Hence, there lies at the foundation of the principle that the lapse of time will become a defense to the title of the one in possession of property not only consideration for his personal rights and equities, but also a recognition of the higher public interests, which can only be subserved

by putting at rest, as speedily as possible, all doubts and uncertainties touching the title of realty, to which end it is the duty of courts to discourage delays in the assertion of conflicting claims thereto.

We conceive this case to belong to a class which imperatively calls for a strict application of the rule that courts of equity will move only in behalf of the diligent. Grants like those under which the parties hereto respectively claim the premises in dispute embrace large quantities of land, and yet the grants do not describe the particular sections that are included therein. The line of the railway must be located to the satisfaction of the secretary of the interior, and the actual limits of the grant are then defined by the officers of the land department, and in case of indemnity lands, the selections are made by the agents of the state, and, upon approval by the secretary of the interior, they are certified to the state for the benefit of the named railroad, and the state then in due time conveys the same to the company. The beneficiaries of such grants well know the steps required to be taken to perfect the evidence of title, and they equally well know that, of necessity, the public must rely upon the acts of the state and United States officials in apportioning the lands covered by different grants, as evidence of the ownership thereof; and, therefore, where there are grants that may conflict, and the state and national authorities undertake, as it is their duty to do, to apportion to each grant the lands covered thereby, and conveyances are made to the state and by the state to the respective railway companies, and the latter then proceed to sell the same to actual settlers, if either company intends to question the correctness of the selections or apportionment thus made, good faith requires that prompt action shall be taken, or it will, in the interests of the public, be held that the apportionment has been acquiesced in.

In the case at bar it cannot be otherwise than that the Hastings & Dakota Company well knew that the prior grants contained in the acts of 1857 and 1865 had been made, and that the line of the defendant company was so located that there might be a conflict between the grants to the defendant company and that to the Hastings & Dakota Company. It cannot be otherwise than that it was well known to the Hastings & Dakota Company that the state and United States officials would, of necessity, be called upon to make the selections of the lands belonging to each company, and to cause them to be certified to the state, and that in fact these officials did make the selections, and that the governor of the state in writing requested the certification of the lands in dispute to the state for the benefit of the defendant company, and when they were so certified the state in due time deeded them to the defendant. It was open to the Hastings & Dakota Company to have preferred its claim, if it deemed it had one, before the officials of the land department and the secretary of the interior to the lands now in dispute, or to the state authorities, after the certification to the state; but it was then silent. When the lands were deeded to the defendant, it could then have asserted its claim thereto, and, if its right and title was denied, it could have invoked the aid of the court of equity to enjoin the sale of the lands until the questions in dispute had been put at rest. It

took no action, but silently stood by, and permitted the lands now the subject of dispute to be sold to actual settlers, and then, after the lapse of 14 years, it filed the present bill, for the purpose of asserting that the selections made by the state officials, and approved by the secretary of the interior, and confirmed by the certification to the state, and by the conveyance of the state to the defendant company, were based upon a wrong construction of the grants in question,' and that since 1867, the Hastings & Dakota Company has been the equitable owner of the land, and now seeks the interposition of the court of equity to enforce its long dormant claim to the property. Every consideration for public and private interests alike calls upon the court to refuse its aid to a claimant who, without excuse, has permitted so many adverse interests to grow up in ignorance of the claim now sought to be asserted.

It is said in argument that no injury will be caused to the settlers upon these lands, because the court can award a money judgment against the defendant corporation. The bill prays that the complainant be adjudged to be the owner of the entire 20,807 acres, and the instant it was filed it threw a cloud over the title of every acre, and the settlers thereon have been from that day, and are now, sufferers by reason of the attack thus made upon the validity of the titles under which they hold their farms. The instant this bill became *lis pendens* the title of the settler was attacked, and the value of his property, if he wished to sell, was necessarily depreciated. The fact that the title under which the settlers held their farms was thus attacked and clouded must have greatly discouraged the settlers, and deterred them from making valuable and permanent improvements upon their lands,—a loss to the settlers and the community alike, which can never be made good, for no human power can recall the years that have elapsed.

We are not willing, by entertaining a bill of the nature of the one now before us, to cast doubt and uncertainty upon the title to thousands of acres of land occupied by actual settlers, which title is based upon grants in aid of the construction of lines of railway, and where the state and United States officials have apportioned the lands supposed to be covered by the several grants, and such apportionment has been acquiesced in for years by the railway companies interested in such grants. Every consideration of public and private interests require that repose be quickly assured to rights acquired under such circumstances, and hence, as already said, this case belongs to a class which demands vigilance, diligence, and prompt action on the part of any individual or corporation that purposes to question the rightfulness of the apportionment made by the public officials, under grants of the kind giving rise to the present controversy.

In our judgment, the defenses based upon the statute of limitations and upon the laches of the Hastings & Dakota Company are a complete answer to the bill herein filed, and we are therefore relieved from the consideration of the other questions presented on the record.

The decree appealed from is reversed, and the cause is remanded to the circuit court, with instructions to dismiss the bill for want of equity, at the cost of complainant.