## LEMOINE *v.* DUNKLIN COUNTY.

*Circuit Court of Appeals, Eighth Circuit.* July 25, 1892.

### No. 38.

1. LACHES—TRUSTEES—REPUDIATION OF TRUST—PURCHASE OF SWAMP LAND.

The issuance of receipts and certificates of purchase of swamp lands belonging to a county, by the proper officers thereof, makes the county a trustee holding the legal title of the lands for the benefit of the purchaser, and laches cannot be imputed to the latter in respect to delay in obtaining a conveyance, until the county has repudiated the trust by some unequivocal act.

2. SAME—PAROL EVIDENCE.

A suit was commenced in 1888 to compel a county to convey swamp lands to the holder of certificates of purchase issued by the county officers in 1857. The defense was laches. The county court was the proper authority for making the conveyances, but there was no statute requiring demands for deeds to be made a matter of record. Furthermore the records of the county had been destroyed in 1872. *Held* that, for the purpose of showing a repudiation of its relation of trustee holding the legal title for the certificate owners, the county was entitled to show by parol evidence that demands for deeds were often made to the court in 1866, and were continuously refused on the ground of fraud.

3. SAME—WHAT CONSTITUTES.

The delay of 22 years after the repudiation of the trust constituted laches, and plaintiff could not maintain the suit. 46 Fed. Rep. 219, affirmed.

Appeal from the Circuit Court of the United States for the Eastern District of Missouri. Affirmed.

Statement by CALDWELL, Circuit Judge:

This is a suit in equity commenced on the 2d day of July, 1888, in the circuit court of the United States for the eastern district of Missouri, by the appellant, Louis R. Lemoine, against Dunklin county, the appellee, to compel the county to convey to the appellant about 17,000 acres of land, which the bill alleges the county holds in trust for the appellant, and to require the county to account for the proceeds of such of said lands as it has sold. The lands in question are swamp lands, granted by the United States to the state of Missouri by act of congress approved September 28, 1850, and granted by the state to the county

in 1851. The receiver and register of swamp lands for the county were invested by law with authority to sell the swamp lands of the county; and, in 1857, these officers issued receipts and certificates of purchase for a portion of these lands to sundry persons, who subsequently transferred their rights to the appellant. The certificates of purchase were in the following form:

"LAND OFFICE AT KENNETT, DUNKLIN COUNTY, STATE OF MISSOURI.

"No. 425.                                            JANUARY 26, 1857.

"It is hereby certified that in pursuance of law Clark and Richardson, of Shelby county, state of Tennessee, on this day purchased of the register of this office, [here follows a description of the lands,] at the rate of one dollar per acre, amounting to —————— dollars, for which the said Clark and Richardson have made payment in full as required by law. Now, therefore, be it known that, on presentation of this certificate to the governor of the state of Missouri, the said Clark and Richardson shall be entitled to receive a patent for the lots above described.

[Signed]                                    "JAMES B. RICE, Register."

On the 27th of February, 1857, an act of the legislature of the state, vested in the county court of the county the exclusive power to make deeds or conveyances of the swamp lands belonging to the county. As to the principal portion of the lands, the leading facts, as far as they are disclosed by the record, are these: An act of the legislature authorized the county to receive the stock of the Dunklin & Pemiscot Plank Road Company, at the rate of one dollar per acre, for the swamp lands of the county lying within six miles of the proposed plank road. The road was surveyed and located, and the company issued its stock to the county, at the rate of one dollar per acre for the land lying within six miles on each side of the line of the road, as located, and received in exchange therefor, from the proper county officer, certificates setting aside these lands to the company. The company transferred its interest in the lands under these certificates to Clark and Richardson, and Clark and the heirs of Richardson transferred their interest therein to the appellant. The plank road was never built.

The county answered, among other things, that it had never recognized appellant's or his grantors' rights to the lands; that the certificates of purchase were procured by fraud; that the lands were never paid for; that the plank road was never built, and the company never intended to build it; that the appellant's grantor, Clark, in 1866, while he was the owner and holder of said certificates, and repeatedly afterwards, demanded patents for the lands of the county, which had been refused; that the lands have been in the adverse possession of the county more than the period required by the statutes of limitations to bar an action for their recovery; that the county had at all times, and continuously, from the year 1859 down to the bringing of this suit, distinctly notified Clark and his grantees that said certificates were fraudulent and void, and that it would not convey to him or his grantees the said lands; that during all of that time, the county, to the knowledge of Clark and his grantees, was selling and conveying these lands to *bona fide* purchasers,

who went into possession and made valuable improvements, and that a large proportion of the lands have thus been sold; that appellant has been guilty of laches, and that his claim is stale. Other defenses were pleaded, not necessary to be noticed. A demurrer was filed to the bill, which was overruled. 38 Fed. Rep. 567. Upon final hearing, the court below dismissed the bill for want of equity, (46 Fed. Rep. 219,) and the complainant appealed.

*E. Cunningham, Jr.*, and *Edward C. Eliot*, (*Phillips, Stewart, Cunningham & Eliot*, on the brief,) for appellant.

*G. H. Shields, Jos. Dickson*, and *Eleneious Smith*, (*Chas. P. Hawkins*, on the brief,) for appellee.

Before CALDWELL and SANBORN, Circuit Judges, and SHIRAS, District Judge.

CALDWELL, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The relation between the vendor and vendee of lands under an executory contract to convey is that of trustee and *cestui que trust* of an express trust. This was the relation established between the county and the holder of these certificates. There has been contention at the bar whether such a trust is an express or an implied trust. Calling it by either name will not change its nature or vary the rights and obligations of the parties. By whatever name called, it is a trust which imposed on the county the obligation to convey the lands to the holders of the certificates, and to hold the legal title to the lands in trust for that purpose. *Lewis* v. *Hawkins*, 23 Wall. 126; *Lemoine* v. *Dunklin Co.*, 38 Fed. Rep. 567. With reference to trusts of this nature, the rule undoubtedly is that, so long as nothing is done by the trustee or the *cestui que trust* to change their relations, the mere efflux of time will not impair the obligations of the one or the rights of the other. In express trusts no length of time is a bar, and laches will not be imputed to the *cestui que trust* until the trustee plainly and unequivocally denies the trust, and such denial comes to the knowledge of the *cestui que trust*. But when the trustee of an express trust, by clear and unequivocal acts and declarations, repudiates and disavows the trust, and such repudiation is brought home to the *cestui que trust*, from that time the bar begins to run, and laches may be imputed to the *cestui que trust*. This rule is not questioned. But it is earnestly contended that there is no competent evidence to show that the county ever repudiated the trust prior to 1886, when the present complainant demanded a deed, which was refused. The real question in the case is fairly stated by the learned counsel for appellant to be, "Whether or not appellee ever before that time [1886] repudiated or denied the trust in such a way as to make it the duty of appellant or his grantors to bring their suit, is the question for the consideration of the court." This is a question of fact upon which we have had no difficulty in coming to a satisfactory conclusion. The parol evidence to prove Clark's demand on the county court for a deed, and the court's refusal to make the deed in 1866, is objected to on the ground that the county court is a court of record, and

that its official acts can only be proved by its records.   There are several answers to the objection to this testimony.   In the first place, the county records, including the records of the county court for that period, are shown to have been destroyed by fire.   It must be remembered that the only object of the testimony· is to establish the fact that the county disavowed the trust, and that Clark had notice of the fact.   It would seem that the testimony of persons who were present and saw Clark exhibit his certificates, and heard him demand deeds on them, and heard the county judge refuse his demand, and deny the validity of the certificates, is at this day, and under the circumstances of this case, the best attainable evidence of these facts.   The court takes judicial notice of the general condition and history of the country.   It is very well known that county courts in Missouri at those times, in counties like Dunklin, were not very formal or ceremonious in the transaction of the county's business.   There was a good deal of pristine simplicity in the procedure of these courts in those times.   The business of the citi· zen with the court was usually transacted without the intervention of a lawyer, and justice was not delayed or baffled by forms and technicalities.   The citizen having business with the county conferred freely with the county judge about many matters, without the formality of a written petition.   It is not likely that Clark filed any written petition requesting the county to make him deeds.   It is more probable that the request was made orally, and that the refusal was made in the same way by the county judge.   The fact that this request was frequently preferred by Clark during the period of three years renders it highly improbable· that it was in writing, or that a record was ever made of any of the demands and refusals.

One of the witnesses, who has been surveyor, prosecuting attorney, and representative of the county, testifies that for several years—he is quite certain for as many as three years, beginning with 1866—Clark was present at "almost every court trying to get the county court to issue a patent on these certificates," and that the court "refused to patent the lands."   In answer to the question, "What were the actions of the court, if you remember?" he says, "Well, the court got so it did not pay much attention to him.   You know it was a common thing."   Certainly there ·is no statute or rule of law which made it the duty of the county court to make a record of Clark's request and its refusal each time that he made it, and such repeated requests and refusals can undoubtedly be proved by parol, for the purposes desired in this case.   It is not a record, or its contents, that is sought to be proved.   The object of the evidence is to prove that Clark had knowledge of the fact that the county, by its duly-authorized agents, denied the validity of the certificates, and repudiated his claim to the lands.   For this purpose we think it is competent original evidence.   Independently of this testimony, it is apparent from the other evidence in the case that Clark had knowledge of these facts while he continued to be the owner and holder of the certificates.   His claim to the swamp lands of the county was a matter of public interest.   It concerned every taxpayer in the county, and would be talked about and discussed, as such things always are among the people.   The atti-

tude of the county in the matter was, of course, known to the county officers, and, in all probability, to every intelligent citizen in the county. Besides, the deeds from the county to the purchasers of these lands were being placed on the public records, and the purchasers were entering into the actual possession of the lands and improving them. It is incredible that the man who claimed that the county was under obligation to deed the lands to him should be the only man in the county who did not know the county denied his right, and was selling the lands to others. It is a fair conclusion from all the evidence that Clark had knowledge that the county denied his rights and repudiated the trust as early as 1859, and it is conclusively shown that he had that knowledge in 1866, and that at these times he was the holder and owner of the certificates which are the foundation of this suit. The county began the sale of the lands in 1859, and down to the bringing of this suit had sold over 10,000 acres, mostly to persons who settled upon and improved the same. The lands have greatly increased in value. All the public records of the county have been twice destroyed by fire, once during the civil war, and again in 1872. The persons who were in official positions in the county at the time the complainant's cause of action accrued, and who had knowledge of the rights of the county in the premises are dead, or have gone to parts unknown. Clark, then the owner and holder of these certificates, is dead, and his partner, Richardson, who was interested with him in some of the certificates, is dead.

Upon these facts the court below rightly dismissed the complainant's bill on the ground of laches. 46 Fed. Rep. 219. The court will not speculate as to what defense the county had to the demands now made upon it, or whether it had any. It is enough to know that with full knowledge that the county repudiated the trust, and was dealing with the trust property as its own, the *cestui que trust* delayed for more than a quarter of a century to bring suit to enforce the trust. No excuse is shown for this long delay, and there was no reason for it compatible with an honest purpose. By reason of this delay the facts of the transaction can never be known. The records of the county have been destroyed, and the parties, save the county and the witnesses, are dead. It is a significant fact that even complainant himself is without the original evidence and records necessary to the maintenance of his suit, and is compelled to ask the court to accept secondary evidence, for the reason, as stated by his counsel in their brief, that "the original instruments, and the original records thereof, have been lost or destroyed." Whether the complainant's secondary evidence is the best attainable, or whether it is sufficient for the purpose intended, we need not inquire. The appeal made for its admission and consideration proves that the ravages of time have not dealt alone with the defendant's records and evidence, and shows how futile it would be for the court to attempt to deal with the case upon facts which transpired 30 years ago. Time and its accidents have interposed an insurmountable obstacle to such an inquiry. But one thing is certain in the case, and that is the lapse of time.

The calendar cannot be impeached, and it testifies with conclusive force to the gross laches of the complainant and those under whom he claims.

Laches is imputed independently of the statute of limitations. Courts of equity apply the doctrine on principles of their own, and time is only one of the circumstances to be considered in its application. It is settled, say the supreme court, "that laches is not, like limitations, a mere matter of time, but principally a question of the iniquity of permitting the claim to be enforced,—an iniquity founded upon some change in the condition or relations of the property or the parties." *Galliher* v. *Cadwell*, 145 U. S. 368, 12 Sup. Ct. Rep. 873; *Godden* v. *Kimmell*, 99 U. S. 201; *Mackall* v. *Casilear*, 137 U. S. 556, 11 Sup. Ct. Rep. 178.

Referring to this doctrine, Mr. Justice BREWER, in delivering the opinion of this court in *Naddo* v. *Bardon*, 4 U. S. App. ——, 51 Fed. Rep. 493, said:

"No doctrine is so wholesome, when wisely administered, as that of laches. It prevents the resurrection of stale titles, and forbids the spying out from the records of ancient and abandoned rights. It requires of every owner that he take care of his property, and of every claimant that he make known his claims. It gives to the actual and long possessor security, and induces and justifies him in all efforts to make valuable the property he holds. It is a doctrine received with favor, because its proper application works out justice and equity, and often bars the holder of a mere technical right, which he has abandoned for years, from enforcing it when its enforcement will work large injury to many."

The lapse of time which will induce the court to apply the doctrine may be longer or shorter, depending on the circumstances of the particular case. Among the circumstances which will induce its application in a comparatively brief period are the changed condition of the property, particularly in respect to its value and the number of innocent parties to be injuriously affected, (*Oil Co.* v. *Marbury*, 91 U. S. 587; *Felix* v. *Patrick*, 145 U. S. 317, 12 Sup. Ct. Rep. 862; *Galliher* v. *Cadwell*, 145 U. S. 368, 12 Sup. Ct. Rep. 873; *Railroad Co.* v. *Sage*, 4 U. S. App. 160, 1 C. C. A. 256, and 49 Fed. Rep. 315; *Naddo* v. *Bardon*, 4 U. S. App. ——, 51 Fed. Rep. 493.) the death of the parties, the death or removal of witnesses, and the loss or destruction of public records or other muniments of title. Nearly all of these circumstances are present in this case.

Upon the authorities and the circumstances of this case the appellant was barred by laches many years before this suit was instituted. Relief has been denied on the ground of laches, where the delay was only 2 years, (*Holgate* v. *Eaton*, 116 U. S. 33, 6 Sup. Ct. Rep. 224; *Societe Fonciere* v. *Milliken*, 135 U. S. 304, 10 Sup. Ct. Rep. 823;) where it was 4 years, (*Oil Co.* v. *Marbury, supra; Hayward* v. *Bank*, 96 U. S. 611; *Credit Co.* v. *Arkansas Cent. R. Co.*, 15 Fed. Rep. 46,) where it was 5 years, (*Harwood* v. *Railroad Co.*, 17 Wall. 78; *Davison* v. *Davis*, 125 U. S. 90, 8 Sup. Ct. Rep. 825;) where it was 6 years, (*Galliher* v. *Cadwell, supra*;) where it was 7 years, (*Brown* v. *County of Buena Vista*, 95 U. S. 157;)

where it was 10 years, and the suit was grounded on an express trust, (*Naddo* v. *Bardon, supra;*) where it was 14 years, (*Railroad Co.* v. *Sage, supra;*) and where it was 28 years, (*Felix* v. *Patrick, supra.*) The list of cases might be multiplied indefinitely. They embrace all kinds of obligations and property rights, and turn upon facts as varied as the transactions of men. It is not necessary to look beyond the decisions of this court for authorities to support the proposition that complainant, if he ever had any rights, has long since lost them by laches of himself and those under whom he claims. *Railroad Co.* v. *Sage, supra; Naddo* v. *Bardon, supra.* The doctrine of these cases is fully supported by the authorities cited in the opinions and by the recent judgments of the supreme court in the cases of *Galliher* v. *Cadwell, supra,* and *Felix* v. *Patrick, supra.* The decree of the circuit court is affirmed.