113 U.S. 585 (1885)
PEARCE & Another
v.
HAM.
Supreme Court of United States.
Submitted January 9, 1885.
Decided March 2, 1885.
APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF ILLINOIS.
*586 Mr. John M. Palmer for appellants.
Mr. Samuel P. Wheeler for appellee.
MR. JUSTICE WOODS delivered the opinion of the court.
The bill was filed by Charles I. Ham, the appellee, against Isaac N. Pearce and Andrew J. Kuykendall, the appellants. The record showed the following facts: On August 5, 1868, one Joseph K. Frick entered into a contract in writing of that date with the County Court of Johnson County, in the State of Illinois, by which he agreed to build, according to certain plans and specifications, a court-house for said county, at Vienna, the county seat, furnishing the material and completing it by the first Monday of September, 1870, in consideration whereof the County Court agreed to pay him $38,357 in the bonds of Johnson County, bearing ten per cent. interest, and due in six years. The bonds were to be paid in instalments, one-fourth at the time of the execution of the contract, one-fourth when the work was half done, one-fourth when the work was three-fourths done, and the residue when it was completed. Frick, to secure the performance of his contract, executed to the judges of the County Court, a bond in the penal sum of $20,000, with the appellant, Andrew J. Kuykendall as his surety.
Frick never did any work on the building, and, owing to some misunderstanding with the County Court, abandoned the contract, and told Kuykendall that he might go on and build the court-house if he chose to do so. On September 9, 1869, Kuykendall, as the agent and attorney in fact of Frick, assigned the contract of the latter to Ham and Pearce, Ham being the appellee, and Pearce one of the appellants, who had formed a partnership for the purpose of building the court-house under said contract.
*587 Before accepting the assignment, Ham, who was a practical mechanic, read the contract and made an estimate of the cost of the building according to the plans and specifications, and told Pearce "that there was no money in the contract." He therefore suggested six changes in the plan which would greatly reduce the cost, and would not detract from the general utility of the building, and explained them to the County Court. The court, without insisting on any reduction in the price to be paid, agreed that the changes might be made, and suggested two others, to which Ham assented, and, with the original contract of Frick thus modified, Ham and Pearce accepted the assignment of the contract and undertook to perform it.
About October 1, 1869, they begun work on the building, did some excavating for the foundation, and quarried and delivered some stone. This work was carried on under the supervision of Ham, and amounted in value to $690, the most of which was paid by Pearce, but the sum so paid was afterwards refunded to him.
Afterwards Ham, believing that the work of building the court-house could be sub-let so as to afford a large profit to Pearce and himself, with that view entered upon a treaty with one Wickwire, and, on December 8, 1869, Wickwire having assented to the terms proposed by Ham, the firm of Ham & Pearce made a contract in writing, of that date, with Wickwire, by which he agreed to furnish the materials and build the court-house according to the modified plans and specifications, and to complete it by the first day of November, 1870, in consideration whereof Ham & Pearce agreed to pay him $27,300 in the bonds of Johnson County, at par, in four equal instalments, the first when Wickwire began the work, the second when one-third, the third when three-fourths, and the fourth when all the work was completed. Ham told Wickwire that he should probably be in Vienna and see him every day, and if so he would render him all the assistance in his power in the erection of the building and the negotiation of the bonds. Kuykendall, as the agent of Frick, had already received from the County Court one-fourth of the bonds which they were to pay for the building of the court-house, and at *588 once turned over to Pearce bonds of the face value of between $8,000 and $9,000, and a special county order for $400. Having made the contract with Wickwire, Ham left Vienna, and about February 1, 1870, engaged in the construction of a piece of railroad in Indiana, which he had contracted to build, and did not return until the court-house was completed. Wickwire, under the supervision and inspection of an agent appointed by the County Court, did, in fact, furnish the materials and build the court-house according to the plans and specifications specified in Frick's contract as subsequently modified. The work and materials seem to have been in all respects satisfactory to the County Court, who accepted the court-house and paid the contract price, $38,357, in the bonds of Johnson County, at par.
These bonds were delivered in instalments by the County Court to Kuykendall, who used them either directly or indirectly to pay Wickwire the amount which he was to receive for the building of the court-house and divided the residue between himself and Pearce.
The object of the suit was to obtain an account of what was due to Ham by virtue of his said partnership and partnership enterprise, and that Pearce and Kuykendall might be decreed to pay him what might be found due on such accounting either in cash or Johnson County bonds.
Upon final hearing upon the pleadings and evidence, the Circuit Court rendered a decree in favor of Ham against Kuykendall and Pearce for $5,001. The appeal of Kuykendall and Pearce brings that decree under review.
Ham and Pearce, it is conceded on all hands, engaged as partners in the enterprise of building a court-house for the county of Johnson. It plainly appears that Ham secured such a modification of the plan and specifications of the court-house as to enable Pearce and himself to build it at a profit, and not at a loss; that after this modification the contract by which Frick had engaged to erect the building was assigned to Ham & Pearce by Kuykendall, acting as attorney in fact for Frick, and that Ham & Pearce sub-let the contract to Wickwire on such terms as would yield them a profit of at least $10,000. Ham's *589 interest was worth, as it turned out, not less than $5,000. Without his consent, Ham's share of the profits of his partnership venture was appropriated by Kuykendall and Pearce. These facts alone considered justify the decree of the Circuit Court, and that decree should be affirmed, unless the reasons assigned by Pearce and Kuykendall afford good ground for the appropriation by them of Ham's share in the profits of the enterprise.
The answers of both Pearce and Kuykendall, which were not under oath, alleged that after the contract between Ham & Pearce with Wickwire had been made, Pearce, on account of the absence and neglect of Ham, cancelled the contract, and Kuykendall cancelled the assignment to Ham & Pearce of the contract of Frick. But it appears from their testimony that this was only a mental operation. There was, in fact, no cancellation of either the Wickwire contract or of the assignment of the Frick contract. Pearce handed a copy of the Wickwire contract to Kuykendall to be cancelled, but Kuykendall immediately returned it to him uncancelled for safe keeping. The assignment of the Frick contract was allowed to remain uncancelled upon the records of the County Court. What was done, as plainly appears by the testimony of Pearce and Kuykendall, was this: Wickwire, without any new contract in writing between him and Kuykendall or between him and Kuykendall and Pearce, was allowed to perform, and did perform without any change whatever in its terms, the contract entered into by him with Ham & Pearce. Kuykendall simply took Ham's place in the enterprise, agreeing verbally with Wickwire that he would negotiate the county bonds at ninety cents on the dollar.
One excuse given for this is stated by Pearce to be that when he went into the enterprise with Ham it was with the expectation that Ham, who was a practical builder, would superintend the work, and that he himself would manage the financial affairs of the partnership. But this was the understanding when they expected to carry out the contract themselves, and the necessity for any supervision of the work or financial management mainly ended when they sub-let the contract to Wickwire. *590 He carried on the work apparently with fidelity, and certainly to the satisfaction of the County Court, under the eye of a supervisor appointed by the court. The only financial duty to be performed by Pearce under the contract of Ham & Pearce with Wickwire was to draw the county bonds as the work progressed, and hand them over to Wickwire as he be came entitled to them. There was no necessity for the supervision of Ham, and it is not alleged or shown that any delay or damage resulted for want of his supervision.
Some other pretext was needed for putting Ham out of the enterprise and taking Kuykendall in. This was found in the alleged fact that Ham had agreed with Wickwire to assist him in negotiating the county bonds, or enough of them to raise $5,000, and had left the neighborhood and failed to perform that part of his contract, and that Wickwire for want of $5,000 in cash was unable and refused to proceed with the construction of the building. Thereupon it became necessary for Kuykendall, who insisted that he was liable as surety for Frick for the building of the court-house, to take Ham's place and negotiate the bonds so that the work might proceed to completion within the time limited by the Frick contract.
But the written contract with Wickwire, which embodied the result of his treaty with Ham & Pearce, contained no provision by which the latter bound themselves to negotiate the bonds for Wickwire. He agreed to receive the bonds themselves as his compensation. Whatever Ham may have said to Wickwire about negotiating the bonds was a mere voluntary and conditional offer and formed no part of the consideration for the contract, and the absence of Ham and his failure to help sell the bonds, did not release Wickwire from his obligation to perform his contract; nor could the neglect of Ham to perform his individual promise, made not to Pearce but to Wickwire, furnish a ground upon which Pearce could legally dissolve his partnership with Ham without Ham's consent.
But the testimony in the record is abundant to show that the bonds sold readily at their market price, which was not less than ninety cents on the dollar. They were the bonds of a solvent county and bore ten per cent. interest payable annually, *591 and no sort of defence to them had ever, so far as appears, been raised. There was, therefore, no reason why they should not readily sell for ninety cents on the dollar, which was the price Wickwire was willing to take for them. Anybody could have sold them. But the hollowness of his excuse for turning Ham out of his enterprise and taking Kuykendall in, is found in the fact that when Wickwire came to Pearce and told him he could not go on with the contract for want of $5,000 in money, Pearce had in his possession between $8,000 and $9,000 in Johnson County bonds, with more than one year's interest at ten per cent. due thereon, and over $400 in a special order, turned over to him by Kuykendall as the agent of Frick, and being part of the first instalment on the contract for building the court-house. These bonds and the special order were without question the property of the partnership of Ham & Pearce. All that it was necessary for Pearce to do was to sell the bonds and furnish Wickwire with the money he said he wanted, or hand him the bonds. Wickwire testifies that if the bonds had been handed him he thinks he would have begun the work. But Pearce, according to his own testimony, never offered Wickwire the bonds, or even informed him that he had them in his possession, and he does not aver or swear that he made any effort to sell the bonds; and, although he avers in his answer that he tried to raise the $5,000 for Wickwire, he does not testify to the fact in his deposition. It, therefore, plainly appears from the evidence, that when Wickwire told Pearce that he could not begin the work for want of $5,000 in money, the latter had assets of the firm of Ham & Pearce in his hands to the amount of nearly $10,000, which could have been readily disposed of at ninety cents on the dollar; and it does not appear that Pearce made any effort to sell the bonds or in any other way raise the sum needed.
There is nothing in the testimony to show that Pearce did anything more towards carrying on the business enterprise of the firm of Ham & Pearce than was done by Ham. He did not superintend the work, or manage the finances of the firm. His only part in the business of building the court-house appears to have been to keep partial and fragmentary accounts for *592 Kuykendall. It is true that, by some arrangement with Wickwire, he accepted the orders of Kuykendall, given for labor and materials, and paid them in merchandise to the amount of about $20,000; but this was his own private business as a merchant, carried on for his individual profit.
In his answer, Kuykendall bases his defence on the ground, that all he did in the matter was in the interest of Frick, and as his agent, and to protect himself against his liability as surety on Frick's bond. But, when he testifies in the case, it appears that he was acting for himself only, and proposed to keep his share of the profits made in the erection of the court-house. He knew that when Wickwire was asserting that he could not begin the work for want of $5,000 in cash, Pearce had Johnson County bonds belonging to the firm of Ham & Pearce, which could have been readily turned into cash at 90 cents on the dollar, sufficient to raise between $8,000 and $9,000, for he himself had delivered these bonds to Pearce for the firm. He knew, therefore, that the excuse of Pearce, that he could not raise money for Wickwire, was a subterfuge. Both he and Pearce knew that Ham had not abandoned the enterprise, for, in the spring of 1870, Pearce visited Ham in Indiana, and proposed to him that they should allow Kuykendall an interest of one-third in their venture, and that Ham declined to accede to the proposition.
Kuykendall testifies that he sold $16,000 of the county bonds for 80 cents on the dollar, but he does not mention the name of any purchaser at that price, and no witness testifies that he ever bought a bond for less than 90 cents, except one, who says he bought two bonds, not of Kuykendall, but of one McDemot, who at first asked 85 or 90 cents on the dollar for this bond, but afterwards took 75 cents, because, as he said, "he was bound to have some money." But even if Kuykendall did sell a part of the bonds at 80 cents on the dollar, he cannot impose upon Ham a loss incident to his own unwarrantable interference in Ham's affairs.
In their answers both Pearce and Kuykendall aver that after the alleged cancellation of the contract between Ham & Pearce and Wickwire, Pearce had no further concern with the enterprise *593 or interest therein, and Kuykendall avers that, as agent of Frick, he sub-let the contract to Wickwire. But in his deposition Kuykendall testifies that he divided equally with Pearce the profits made on the contract, which statement is not contradicted by Pearce in his testimony.
Ham had an interest in the assets and prospective profits of the firm of Ham & Pearce. It does not appear that he failed to perform any duty which, as a member of the firm of Ham & Pearce, he had undertaken to perform, or that, with good faith on the part of Pearce, the partnership enterprise could not have been successfully carried out. And however the question may be decided, whether one partner may by his own mere will dissolve a partnership formed for a definite purpose or period, it is clear that upon such a dissolution one partner cannot appropriate to himself all the partnership assets, or turn over the share of his partner to another with whom he proposes to form a new partnership.
The case, as presented by the evidence, is this: Pearce undertook, without any just cause, to exclude Ham, his partner, from an interest in a valuable contract, in which they were equally concerned, and to take in Kuykendall in his stead, and Kuykendall, knowing that Pearce could not rightfully exclude Ham, conspired with Pearce to accomplish that purpose, and undertook to appropriate to himself the profits of the contract which of right belonged to Ham. It is clear that these actings and doings of Kuykendall and Pearce had no effect on the rights of Ham; that he is entitled to one-half of the profits of the contract. This conclusion finds ample support, if support be needed, in the case of Ambler v. Whipple, 20 Wall. 546.
The profits are easily ascertained. They would have consisted of $10,000 in the bonds of Johnson County, bearing ten per cent. interest, and, at the time of the bringing of this suit, there was at least three years' interest due on the bonds, making in principal and interest $13,000. Estimating the bonds to be worth only 90 cents on the dollar, the amount due Ham exceeded the decree rendered in his favor by the Circuit Court, even after allowing Kuykendall a reasonable compensation for any services rendered by him.
*594 The entire profits were appropriated by Pearce and Kuykendall, and they must account to Ham for his share.
Decree affirmed.