## WILLIAMSON et al. v. MONROE et al.

(Circuit Court, W. D. Arkansas, Ft. Smith Division. March 21, 1900.)

1. EQUITY JURISDICTION—ADEQUATE REMEDY AT LAW—SUIT TO SETTLE PARTNERSHIP.

Where a suit in equity has been made necessary to settle the affairs of a partnership, the court will retain jurisdiction therein to administer complete relief between the partners, although as to some of the matters involved adequate relief might have been afforded by an action at law.

2. SAME.

Where it is competent for a court of equity to grant the relief sought, and it has jurisdiction of the subject-matter of the suit, the objection that there is an adequate remedy at law to defeat the jurisdiction must be taken at the earliest opportunity, and before the defendant enters a full defense.

3. EQUITY—LACHES.

A suit in equity will not be stayed for laches before the time fixed by the analogous statute of limitations at law has run, unless unusual conditions or circumstances are shown by defendant, which make it inequitable to permit the suit to be maintained after the lapse of a briefer time.

4. PARTNERSHIP—DUTY OF PARTNERS TO FIRM—FRAUDULENT CONDUCT OF PARTNERS.

Complainants and defendants were partners in a firm which obtained a contract for the construction of 50 miles of a railroad. By agreement between them one of defendants was to take personal charge of the work, receiving a salary therefor from the firm, and was to endeavor to complete it with such expedition and in such manner as to enable the firm, if possible, to secure a further contract upon the same road. Defendants received some assurances from the company that a second contract would be given them, but concealed such fact from complainants, and, acting

in concert, wrote complainants dissolving the partnership, after which they together secured a second contract for the construction of 70 miles of road additional, in which they refused to permit complainants to share. *Held*, that their action was a breach of the duty imposed on them by the law to act in the utmost good faith towards their partners, and that they would be charged with relation to the second contract as trustees of the firm, or, conceding their action in dissolving the partnership to have been effective, would be held to respond in damages to complainants, such damages to be measured by the profits realized on such contract.

5. EQUITABLE ASSIGNMENT—NONNEGOTIABLE NOTE.
A nonnegotiable note given by a partner to a third party, payable when final settlement shall be made on a contract between the firm of which he is a member and a construction company for work, does not operate as an equitable assignment of any part of the money due the firm on such contract, and cannot be used by the construction company in part payment of such amount, since such use would preclude the maker from making any defense which he might have as against the payee.

In Equity. Suit for settlement and accounting between partners.

Ira D. Oglesby and Hugh R. Garden, for complainants.
Hill & Brizzolara, S. R. Cockrill, and D. S. Alford, for defendants.

ROGERS, District Judge. The record in this case is so voluminous as to forbid a discussion of the evidence in detail. If time and other pressing work permitted, an effort to do so could prove of no valuable service. I must content myself by stating such ultimate findings of fact as are essential to a determination of the case, and by declaring the law applicable thereto. At the hearing the argument of both facts and law was unusually elaborate, showing not only great care and intense labor, but a wide research. The abstracts of the evidence and the printed and typewritten briefs cover several hundred pages, and the oral arguments consumed several days. The eminent counsel who presented the case have given the court great assistance, and it has since examined the evidence of the important witnesses, that it might the better weigh and determine their credibility, made necessary by reason of the fact that the testimony on every vital point is irreconcilably in conflict. The bill was filed for the settlement of a partnership, and all that is necessary to be said of the facts will be found in the opinion to follow.

In the spring of 1894 the plaintiffs and defendants Monroe and Lee entered into a partnership as contractors for the construction of railroads, canals, streets, and other rock, gravel, and earth works, under the firm name of Monroe, Strang, Lee & Co., and opened an office in the city of New York. On September 15, 1894, the firm made a contract with the Arkansas Construction Company, a Missouri corporation, domiciled at Kansas City, Mo., for the construction of 230 miles of the Kansas City, Pittsburg & Gulf Railroad. In that contract the plaintiff Williamson does not appear as a party, but one Marion Ford, a mere dummy for Williamson, appears in his stead as constituting the company. This contract covered the entire Kansas City, Pittsburg & Gulf line of railroad from Shreveport, La., to Ft. Smith, Ark., except 40 miles, beginning at Texarkana, Ark., and extending north, which part of the road was then

constructed and in operation. In December, 1894, a controversy arose between the Arkansas Construction Company and Monroe, Strang, Lee & Co. as to the validity of the contract, the construction company refusing to be bound by it for alleged irregularities in its execution, and asserting its invalidity; while the firm of Monroe, Strang, Lee & Co. urged its validity, and insisted upon the right to carry it out. In the meantime, the name of Marion Ford, who had no interest in the contract (even if he had an existence at all), and whose name was, it appears, inserted as representing plaintiff Williamson,—who, for reasons satisfactory to himself, did not care to be known as one of the partners at that time,—dropped out and disappeared. The result of the controversy over this contract, as is usual in such cases, was an effort to compromise their differences by executing a new contract. This was accomplished at Kansas City, Mo., on January 14, 1895, and a contract was entered into by which the firm of Monroe, Strang, Lee & Co. were to construct 50 miles of the Texarkana & Ft. Smith Railway (which is a part of the Kansas City, Pittsburg & Gulf System), beginning at the north end of W. C. Merritt's work, about $14\frac{1}{2}$ miles north of Little river, to a point 50 miles north of the place of beginning, all in Arkansas. This 50-mile contract covered a part of the road embraced in the 230-mile contract, as was also a subsequent 70-mile contract; which latter, as we shall see hereafter, became the principal cause of controversy in this litigation. The consideration, in part, for this 50-mile contract, was the surrender of the 230-mile contract, and the Texarkana & Ft. Smith Railroad also made itself primarily liable to the said Arkansas Construction Company for the payment of all sums of money provided for in the 50-mile contract to Monroe, Strang, Lee & Co., according to the terms of the contract, and also made itself liable for all covenants therein contained. The fact is, however, that the controlling spirits—the chief officers—in the Kansas City, Pittsburg & Gulf Railroad Company, the Arkansas Construction Company, and the Missouri, Kansas & Texas Trust Company (the latter being a Missouri corporation, organized to finance the road, and the Arkansas Construction Company, organized to build it) were one and the same; that is to say, the management of each of these corporations was practically, and to all intents and purposes, the same.

This new 50-mile contract, made at Kansas City on January 14, 1895, after much bickering between Monroe, Strang, and Lee on the one side (Williamson being at that time in New York), and the officers of the Arkansas Construction Company on the other, was finally made by Monroe and Lee, in the absence and without the knowledge or consent of the plaintiffs, although Strang was then in Kansas City. The bone of contention between the contending parties to the contract was an effort on the part of Monroe, Strang, and Lee to induce the Arkansas Construction Company to agree to give them more than 50 miles of work, or, if not, then, at least, a written guaranty that they should have additional work if they completed the 50-mile contract to their satisfaction. This the construction company refused. There is much evidence, pro and con, as to whether Martin, the president of the Arkansas Construction Company, and Gentry, its

chief engineer, did not make an oral promise to give additional work before the 50-mile contract was entered into. It is not important whether they did or not. At the time Monroe and Lee made the 50-mile contract, Strang, as stated, was in Kansas City, and had been in daily conference with them for several days, but he was not present when that contract was made, and did not ascertain, until after he had left Kansas City for New York, that any contract had been made. Williamson was in New York, and took no part in the negotiations for the new contract. While en route to New York, Lee informed Strang of the new contract, and told him that Martin, the president of the Arkansas Construction Company, had taken umbrage at something Strang had said or done pending the negotiations for the contract, and had expressed a desire that, in the execution of the work under the contract, he should not be brought in contact with Strang. At this Strang became offended, and refused to surrender the contract or execute the bond required, and, on reaching New York, at once began negotiations by wire to Monroe, at his home in Lawrence, Kan., to sell his interest in the contract to Monroe and Lee. Monroe objected to this, and insisted that Strang should remain in the firm and assist in the execution of the contract. In the meantime, Lee, who had imparted this information to Strang, and who, the proof shows, was authorized to represent Monroe when he was not present, in all such matters as affected his interests in the partnership, urged Strang to execute the bond to the construction company, and, among other things, represented, in substance, that the officers of the construction company had promised the firm additional work, and he felt sure that they could be trusted, and that the firm would get it. He also represented that he (Lee) stood well with Gentry, the chief engineer of the construction company, and that if he (Lee) was put in charge of the work, and Monroe left to look after matters with the company, he was satisfied they would get the additional work. He also agreed with his partners to go on the work in person, and promised Strang and Williamson to do all he could to get the additional work, and if there was objection to Strang and Williamson because of the old contract, or the stand they had taken in not delivering it up, that he would take the work in the name of Monroe and Lee for the benefit of the firm. Upon these assurances Strang yielded, and he and Williamson signed the bond, and agreed to close the 50-mile contract, and to surrender the 230-mile contract, both of which were accordingly done. By agreement between the partners, Monroe, Strang, and Lee met at Texarkana, Ark., about the middle of February, 1895, and there sublet the work. The weight of the evidence shows that in letting the work an effort was made to get the best class of contractors on the line, in order to expedite the work so that the firm would stand a better show for the additional work, and to accomplish that end agreed to pay better prices to the subcontractors than the work could have been sublet for to other responsible contractors. Steps were at once taken to get the subcontractors, with their outfits, on the line, and commence work. After one or more had reached the line, and others were getting their outfits ready, the construction company, on the 2d of March, sus-

pended the work on the road indefinitely. When this occurred, Monroe was at his home in Lawrence, Kan., and Lee was at Texarkana. Williamson and Strang were in New York. The object in suspending the work was to relocate the line, and secure a better and cheaper route. Gentry called Monroe to Kansas City by wire on March 2d, and there advised him of the situation, and Monroe at once wired Lee at Texarkana: "Work suspended on account of route. Notify all contractors. We are promised work on the north end while waiting. Come here at once." On the same day he wrote Strang, then in New York, of the situation, and among other things said: "He [Gentry] says while we are waiting he will give us 25 or 30 miles of work running towards Shreveport from Ft. Smith. Twelve miles of the 25 will be the line up to Ft. Smith. Any of this he could not give under 30 days. This is the situation at present." Two days later—possibly three—Lee reached Kansas City, and accompanied Monroe to his home in Lawrence, Kan., and there, on the 6th of March, both Lee and Monroe wrote letters to Strang and Williamson dissolving the firm, but retaining their interest in the 50-mile contract. When Strang and Williamson, a few days later, inquired by wire and letter about the 25 or 30 miles of work referred to in the above telegram and letter, both Lee and Monroe represented that Monroe had misunderstood Gentry, whom they then said had offered to recommend an exchange of work on the north end for a part of the 50-mile contract, which offer they promptly declined, and that nothing else had been said about work on the north end. This interview, in which the exchange of work was offered, as they say, occurred either on the 4th or 5th of March. This account of what had taken place is corroborated by Gentry, who denies ever having promised the firm any additional work on the north end of the line. But, after a very careful and tedious and painstaking investigation of the record, I am constrained to find to the contrary. The letter to Strang, quoted above, is too definite, and goes too much into detail, to admit of the misunderstanding now claimed by Monroe. The intimate relation subsisting between Monroe and Lee, both before and after the dissolution; the fact that the dissolution notices were prepared the same day at Monroe's home, and under the advice of his counsel; and the circumstances under which they were prepared and sent out; the Marvin letter; the McIntyre letters; the evasions in their testimony; their fruitless efforts to explain away the effects of their letters; Lee's admissions to Fergerson and others; his letters to subcontractors; their secret arrangement to exchange answers to letters of Williamson and Strang, so that they might tell the same story; and many other established circumstances, all consistent with themselves, —conspire to show that Monroe and Lee were co-operating to conceal the true conditions from their partners, and to keep from them facts important for them to know, and which it was their duty to disclose. I conclude that the dissolution was made in bad faith; that the firm had been promised, after the suspension of the work, additional work while it was waiting for the new location of the road to be made; and that the firm was dissolved in order that Monroe and Lee might get this work to the exclusion of their partners.

This finding is sustained by the letter of Gentry of March 2d, addressed to his resident engineer, Rust. Moreover, for the construction company to have given Monroe, Strang, Lee & Co. additional work pending the suspension was, under the circumstances, the reasonable, the natural, the right, and the honorable thing to do, and that, too, in the interest of all parties, in order to avoid all questions of damages between the construction company and the firm of Monroe, Strang, Lee & Co., and the latter firm and their subcontractors; and that this additional work was offered, or that Gentry promised to recommend to the construction company to give it to that firm, and that it was sanctioned by Martin, the president of the company, little doubt can be entertained.

The court is satisfied, from the Marvin letter, that Gentry promised Lee and Monroe, on the 4th of March, to give the firm additional work, and that they thereupon informed him that it was their purpose to dissolve the firm, and that they did not want the work for it, but for themselves. It is also certain that this suggestion met with the approval of Gentry, and that they then received assurances that, after the firm was dissolved, Monroe and Lee should have additional work. This is shown by the testimony of Fergerson in the interview with Lee on the train, on the 10th of March, and it is also, in a measure, confirmed by the Marvin letter. That this scheme to defraud their partners out of promised work on the north end of the line, and to get it for themselves, was conceived after the Lee telegram and the Strang letter, quoted above, were mailed by Monroe on the 2d of March, and that the plan for its execution was consummated at Lawrence, Kan., before the 8th of March, there can scarcely be a reasonable doubt. That from that time forward Lee and Monroe co-operated to conceal the facts, their correspondence and conduct conclusively show, and their evasive and ineffectual efforts to explain their letters and conduct disclose a painful consciousness of injustice and wrong towards their partners, while Lee, who seems to have been the moving and controlling spirit, is contradicted by numerous witnesses, and his credibility broken down by his own letters, and by the destruction of his letter books containing his correspondence with Monroe between the suspension of the work on the 50-mile contract and the execution of the 70-mile contract. That Lee would deliberately destroy his letter books, or carelessly burn them with other worthless letters, cannot be accepted as either probable, reasonable, or truthful, since such action is wholly inconsistent with the conduct of men engaged in large business enterprises. Their destruction, if true, must be accepted as evidence that they contained inculpatory matter he could not afford to disclose. When Strang and Williamson, in the early part of June, 1895, ascertained that Monroe and Lee had the 70-mile contract, and claimed it to the exclusion of them, Strang went to Kansas City, and in his own behalf, and in that of Williamson, made demand that they be allowed to share in the contract, and offered to share its burdens and contribute their proportionate share of its performance. It was refused. This finding is denied by both Monroe and Lee, but in view of their conduct and their evi-

dence, and the circumstances preceding and following this interview, as disclosed in part by correspondence, their denials should not prevail.

The road covered by the 70-mile contract of Monroe and Lee was constructed first, and immediately thereafter the road under the 50-mile contract of the firm of Monroe, Strang, Lee & Co. was constructed, and, upon its completion, this suit was instituted. Before work was begun on the 50-mile contract, differences had arisen between the plaintiffs and the defendants Monroe and Lee, and, mainly, as the court finds, because of the dissolution of the firm, and the taking by Monroe and Lee of the 70-mile contract in their names, and to the exclusion of the plaintiffs. Plaintiffs doubtless suspected bad faith, and had lost confidence in Monroe and Lee, and the latter, conscious of their own wrongdoing, naturally anticipated litigation when a settlement took place. To preserve the rights of all parties in the execution of the 50-mile contract, Creech was brought in, under a written contract, and given a share in the 50-mile contract, with the right to superintend the work in person and make settlement with the construction company. The money received under the contract was to be deposited in the Merchants' Bank of Ft. Smith, Ark., and could not be drawn out except by the written consent of all the parties. Checks in payment of the expenses of the construction were to be drawn by Mitchell, and countersigned by Creech. Creech made the settlement after he had done the work, but refused to deposit about $80,000 of the profits, and finally sought to bring about a settlement among the partners without complying with his agreement to deposit the funds. For a time the effort to get this money in the bank, or in the hands of a receiver appointed by this court, and the further question as to whether the court had jurisdiction of the parties and the subject-matter, were subjects of contention both in the court and in negotiations outside. Creech sided with Monroe and Lee, and finally turned the money over to Monroe. This struggle was ended when injunctive proceedings were resorted to by the plaintiffs in the United States circuit court at Kansas City, and, by written stipulation, the funds were deposited in the Merchants' Bank of Ft. Smith, Ark., and the receiver discharged, all parties submitting to the jurisdiction of this court. The bill was filed to secure a settlement of the partnership business on the theory that the partnership extended not only to the 50-mile contract, but also to the 70-mile contract. There is no dispute as to the 50-mile contract, so far as the distributive share to which all the parties, including Creech, are concerned. It is only a matter of stating the account between them. There is an additional matter of the acceptance by Creech of an $8,000 instrument of writing, executed by Williamson to the Missouri, Kansas & Texas Trust Company, which will be referred to hereafter, and still another matter as to a construction outfit owned by Strang, which will also be referred to later.

On the above facts the question arises as to whether Monroe and Lee must be held to an accounting to the firm of Monroe, Strang, Lee & Co. for the profits on the 70-mile contract, taken in their own names. A preliminary question is whether Strang and Wil-

liamson are barred by laches from maintaining their suit as to the 70-mile contract. In stating the principles of law applicable on these points, it is not considered necessary, even if time and other pressing duties admitted, to go into an analysis of the cases cited in the elaborate briefs of counsel. Indeed, it is well-nigh impracticable, and, if done, altogether unprofitable.

It was insisted that the court was without jurisdiction as to the 70-mile contract because the law afforded an adequate remedy. If this were true (which is not the case), the necessity for a bill in equity to settle the partnership as to the 50-mile contract, and the other expenses of the firm, was made necessary by reason of the action of Creech, acting in concert, and in the interest of Monroe and Lee, in refusing to deposit the money of the firm in the Merchants' Bank, according to the contract; and the court, having jurisdiction of the case and the parties for the purpose of settling the partnership for the 50-mile contract, will retain it for the purpose of administering complete relief between all the parties. Hopkins v. Grimshaw, 165 U. S. 358, 17 Sup. Ct. 401, 41 L. Ed. 739. Moreover, it is the settled law, in the federal courts, that where it is competent for a court to grant the relief sought, and it has jurisdiction of the subject-matter, the objection that there is an adequate remedy at law should be taken at the earliest opportunity, and before defendants enter upon a full defense. Reynes v. Dumont, 130 U. S. 354, 9 Sup. Ct. 486, 32 L. Ed. 934; Kilbourn v. Sunderland, 130 U. S. 514, 9 Sup. Ct. 594, 32 L. Ed. 1005. The jurisdiction of the court in this case is believed to be beyond dispute.

The rule governing laches in the institution of bills in equity for fraud is admirably stated and abundantly supported by authority in Kelley v. Boettcher (decided by the Eighth circuit court of appeals) 29 C. C. A. 14, 85 Fed. 55. Judge Sanborn, delivering the opinion of the court, said:

"In the application of the doctrine of laches, the settled rule is that courts of equity are not bound by, but that they usually act or refuse to act in analogy to, the statute of limitations relating to actions at law of like character. Rugan v. Sabin, 10 U. S. App. 519, 534, 3 C. C. A. 578, 582, 53 Fed. 415, 420; Billings v. Smelting Co., 10 U. S. App. 1, 62, 2 C. C. A. 252, 262, 263, 51 Fed. 338, 349; Bogan v. Mortgage Co., 27 U. S. App. 346, 357, 11 C. C. A. 128, 135, 63 Fed. 192, 199; Kinne v. Webb, 12 U. S. App. 137, 148, 4 C. C. A. 170, 177, 54 Fed. 34, 40; Scheftel v. Hays, 19 U. S. App. 220, 226, 7 C. C. A. 308, 312, 58 Fed. 457, 460; Wagner v. Baird, 7 How. 234, 258, 12 L. Ed. 681; Godden v. Kimmell, 99 U. S. 301, 310, 25 L. Ed. 431; Wood v. Carpenter, 101 U. S. 135, 139, 25 L. Ed. 807. The meaning of this rule is that, under ordinary circumstances, a suit in equity will not be stayed for laches before, and will be stayed after, the time fixed by the analogous statute of limitations at law; but if unusual conditions or extraordinary circumstances make it inequitable to allow the prosecution of a suit after a briefer, or to forbid its maintenance after a longer, period than that fixed by the statute, the chancellor will not be bound by the statute, but will determine the extraordinary case in accordance with the equities which condition it. The practical result is that a suit in equity for relief on the ground of fraud would not be barred by laches in the state of Colorado in less than three years after the discovery of the fraud, unless unusual circumstances made it inequitable to allow its prosecution. Some of the circumstances which will induce a court of equity to apply the doctrine of laches in a shorter time than that fixed by the statute are the destruction of the muniments of title, the

death or removal of parties, the number of innocent purchasers who may be affected, radical changes in the condition and value of the property, and its speculative character. Lemoine v. Dunklin Co., 10 U. S. App. 227, 239, 2 C. C. A. 343, 348, 51 Fed. 487, 492. When a suit is brought within the time fixed by the analogous statute, the burden is on the defendant to show, either from the face of the bill or by his answer, that extraordinary circumstances exist which require the application of the doctrine of laches; and, when such a suit is brought after the statutory time has elapsed, the burden is on the complainant to show, by suitable averments in his bill, that it would be inequitable to apply it to his case. The cases of Wagner v. Baird, 7 How. 234, 12 L. Ed. 681; Godden v. Kimmell, 99 U. S. 201, 25 L. Ed. 431; Wood v. Carpenter, 101 U. S. 135, 139, 25 L. Ed. 807; and Rugan v. Sabin, 10 U. S. App. 519, 534, 3 C. C. A. 578, 582, 53 Fed. 415, 420,—belong to the class of cases in which the doctrine of laches was applied after the statute of limitations had run. The cases of Billings v. Smelting Co., 10 U. S. App. 1, 62, 2 C. C. A. 252, 262, 363, 51 Fed. 338, 349, and Bogan v. Mortgage Co., 27 U. S. App. 347, 357, 11 C. C. A. 128, 135, 63 Fed. 192, 199, belong to the class of cases in which the court refused to apply the doctrine of laches within the time fixed by the statute. In the latter case this court declared that this doctrine was applied by analogy to the statute of limitations, to promote, not to defeat, justice, and refused to invoke it after a delay of 30 months. It is a familiar maxim of the courts of chancery, long since embodied in our statutes, that no time runs against the victim of a fraud while its perpetrator fraudulently and successfully conceals it. Scheftel v. Hays, 19 U. S. App. 220, 226, 7 C. C. A. 308, 312, 58 Fed. 457, 460; Alden v. Gregory, 2 Eden, 285; Prevost v. Gratz, 6 Wheat. 481, 5 L. Ed. 311; Michoud v. Girod, 4 How. 503, 11 L. Ed. 1076; Badger v. Badger, 2 Wall. 87. 92, 17 L. Ed. 836."

This suit is not barred by any statute of limitations applicable to such cases in Arkansas. Wilson v. Anthony, 19 Ark. 16; Taylor v. Adams, 14 Ark. 62; Sullivan v. Railroad Co., 94 U. S. 811, 812, 24 L. Ed. 324. Nor is there anything shown to take the case out of the rule laid down in the case of Kelley v. Boettcher, supra, to the effect "that under ordinary circumstances a suit in equity will not be stayed for laches before the statute of limitations runs," and. imposing upon the defendants, where the statute has not run, the burden of showing such unusual conditions or extraordinary circumstances as make it inequitable to allow the suit to be prosecuted, or to justify the application of the doctrine of laches.

A number of cases—chiefly mining cases (a class of property subject to great fluctuations of value)—have been cited by defendants to support the doctrine for which they contend, and in some of them the doctrine of laches has been applied after a briefer time has elapsed than in this case, but it is not believed they are applicable to the case at bar. In fact, Kelley v. Boettcher, supra, is itself a mining case. In this case there has been no destruction of evidence, except defendant Lee's letter book, which was destroyed by himself, if at all; no death or removal of parties; no innocent parties to suffer; no death or removal of witnesses; and no such lapse of time as that witnesses would be likely to forget important facts; no property to fluctuate in value; no loss; nothing, except the fact that Monroe and Lee assumed the risk and burden of the work over the protest of Williamson and Strang. Moreover, laches should never be applied to defeat justice, nor should it be applied when it appears, as in this case, that, while plaintiffs felt they had been wronged, yet were without evidence to show it, and when the evidence now shows that no amount of inquiry made of persons

likely to know the facts, at the time the plaintiffs first learned that they were excluded from the 70-mile contract, would, with any reasonable degree of certainty, or even probability, have unlocked the salient facts and writings by which the positive denials of both defendants are now overturned; for, even on the witness stand, those who knew the facts denied them, and the truth was disclosed over their most persistent and earnest efforts to conceal it. The doctrine of laches ought not to be applied under the circumstances of this case, and especially since the institution of a suit at the time the 70-mile contract was executed would most likely, under all the circumstances then surrounding the firm, the construction company, and the railroad company, have resulted disastrously to the firm, not only as to that contract, but as to the 50-mile contract also, while delay could harm no one, and conduce to the benefit of · all the firm. It cannot, therefore, be fairly said that the plaintiffs delayed suit that they might speculate on the chances which the future would give them of avoiding the risk if the venture proved unprofitable, and asserting their claim if the contract resulted in gain, since the defendants had the full opportunity to defeat such contingency by recognizing plaintiffs' rights when the claim was made for an interest in the contract, accompanied by an offer to share its burdens; indeed, they elected to take all the risk when they determined to fraudulently exclude their partners, and should not now be allowed, in a court of equity, to profit by their wrong.

The questions of laches and jurisdiction out of the way, the next inquiry is whether the defendants must be held to an accounting as to the 70-mile contract. Much was said pro and con, at the hearing, as to whether the partnership was one at will, and, if so, whether a partnership at will can be dissolved at any time or not. The question, in the opinion of the court, is not vital,—indeed, unimportant. In view of the peculiar facts in this case, it might well be questioned whether there was not an implied agreement that the partnership should not be dissolved until the work on the Kansas City, Pittsburg & Gulf Railroad was completed. In 2 Bates, Partn. p. 572, the author says:

"But merely that the partnership contract specifies no duration in express terms is not conclusive that it is at will; and, if an intention appears in the articles to continue the partnership until certain objects are accomplished, it will not be considered a partnership at will, but one to continue until its purpose is completed, or the impracticability thereof demonstrated. Thus, a partnership formed to erect a building or construct a railroad is not a partnership at will, but for the completion of the enterprise."

—Citing Pearce v. Ham, 113 U. S. 585, 5 Sup. Ct. 676, 28 L. Ed. 1067; Holladay v. Elliott, 8 Or. 85, 88; Richards v. Baurman, 65 N. C. 162.

That the original contract contemplated this is, I think, quite clear. That the circumstances under which the new contract was executed, coupled with the agreement between the parties that Lee should go on the work and superintend it and try to get the additional work, contemplated a continuance of the partnership until

.the work on that road was done, or they had failed to get the addi-. tional work, may, with much force, be contended. But, as stated, the question is not vital, because it is distinctly held in Karrick v. Hannaman, 168 U. S. 335, 18 Sup. Ct. 138, 42 L. Ed. 489, that:

"According to the authorities just cited, the only difference, so far as concerns the right of dissolution by one partner, between a partnership for an indefinite period and one for a specified term, is this: In the former case, the dissolution is no breach of the partnership agreement, and affords the other partner no ground of complaint. In the latter case, such a dissolution before the expiration of the time stipulated is a breach of the agreement, and as such to be compensated in damages. But in either case the action of one partner does actually dissolve the partnership."

It may be conceded, then, that the partnership was dissolved immediately upon the receipt of the dissolution notices mailed on the 7th of March, 1895.

The question still remains as to whether the 70-mile contract, under the circumstances it was obtained, became an asset or a right of the old firm. The correct determination of this question brings us to consider the nature of the relation of partners. In this case Lee had accepted the position of superintendent of this work for the firm (receiving a salary therefor), ostensibly because he thought it would aid the firm in getting the additional work. He had represented that Martin did not want Strang to be brought in contact with him; that he was on good terms with Gentry, the chief engineer of the construction company; that Monroe was friendly with Martin. It may be doubted whether Lee did not magnify the bad feeling of Martin towards Strang, so as to get to go on the work himself. However that may be, his representations as to that do not accord with Monroe's letter of January 22, 1895. At all events, Lee, by his position of trust, was more than a mere partner. He was charged, by his own solicitation, with the special duty of looking after the 50-mile contract, and to so conduct the work as to commend the firm for the additional work which he had promised, if possible, to obtain for the firm. What is the rule governing partners under such circumstances?

In 1 Bates, Partn. § 303, the author says:

"The partners owe to each other the most scrupulous good faith. Each one has a right to know all that the others know, and their connection is one of great confidence, and the uberrima fides of a fiduciary relation will be the standard of fidelity exacted from them."

See, also, Miller v. O'Boyle (C. C.) 89 Fed. 140.

In Karrick v. Hannaman, 168 U. S. 336, 18 Sup. Ct. 139, 42 L. Ed. 490, the court said:

"Even if the partnership should be considered as having been actually dissolved at that date, yet the dissolution did not put an end to the plaintiff's right to his share in the property and the profits of the partnership. In a case in which both parties, in their pleadings, assumed the partnership to have been dissolved, this court, speaking by Mr. Justice Miller, held that drunkenness and dishonesty on the part of one partner, and his consequent exclusion from the business, did not authorize his co-partner, 'of his own motion, to treat the partnership as ended, and to take himself all the benefits of their joint labors and joint property,' or exempt him from responsibility

to account to the excluded partner. Ambler v. Whipple, 20 Wall. 546, 555, 557, 22 L. Ed. 403. And in a later case the court, speaking by Mr. Justice Woods, said: 'However the question may be decided, whether one partner may by his own mere will dissolve a partnership formed for a definite purpose or period, it is clear that upon such a dissolution one partner cannot appropriate to himself all the partnership assets, or turn over the share of his partner to another, with whom he proposes to form a new partnership.' Pearce v. Ham, 113 U. S. 585, 593, 5 Sup. Ct. 676, 28 L. Ed. 1070."

Under such circumstances, when Monroe and Lee determined to dissolve the partnership, they owed it as a duty to their partners to disclose every fact concerning the partnership business which could affect their rights. It is just to Monroe to say that on March 2d, before brought under the influence of Lee, he did advise Strang, by letter, of the promise of additional work. Monroe and Lee had not then determined on a dissolution. If that work was not promised, both Monroe and Lee knew it before the dissolution notices were mailed, for they both so testify. They did not correct Monroe's mistake of March 2d, contained in his letter to Strang, nor did they impart, in their notice of dissolution, anything else pertaining to the firm's business with the Arkansas Construction Company. From that time forward, as stated, the proof shows that Monroe and Lee studiously avoided giving any definite information to Williamson and Strang about the prospect of new work, and manifestly schemed to keep them in the dark in regard thereto until the 70-mile contract was obtained. Lee, in the meantime, as early as March 10th,—three days after the dissolution notices were mailed (if Fergerson is to be believed),—began arranging to contract for the performance of the new work which had been promised them; and Monroe, one day later (March 11th), in writing to Marvin a confidential letter, refers to the promise of Gentry of March 2d in regard to the new work, and of the dissolution of the firm, and says: "Of course, we will keep this matter confidential, because we have notified the firm of Monroe, Strang, Lee & Co. of our intention to withdraw from the firm, and if the Pittsburg & Gulf feel like giving myself and Lee any work they would undertake it." Monroe now testifies that, when Lee came to Kansas City on March 4th, they saw Gentry, and found out what he understood to be a promise of the new work was a mere proposition to exchange work, which they then promptly declined; and yet, as stated above, he was writing to Marvin, on March 11th, seven days later, of the same promise, and requesting him to keep it confidential. A careful scrutiny of this record shows that, notwithstanding the dissolution notices, so skillfully had the secret and underhanded contrivances been executed, when they got the 70-mile contract their partners still thought it was gotten for the firm, and even then inquiries in regard thereto met with an evasive reply, and further inquiry with none at all. Such conduct cannot commend itself to the mind of a chancellor, and it is at war with the doctrine of the law governing the duties and relations of partners.

A wide range of research, by both counsel and court, has not disclosed precisely such a case as this, nor any case precisely in point; but it cannot be that the principles governing it are involved in serious doubt.

In Mitchell v. Reed, 61 N. Y. 129, the court said:

"It has long been settled by adjudications that generally when one partner obtains the renewal of a partnership lease secretly, in his own name, he will be held a trustee for the firm, in the renewed lease, and, when the rule is otherwise applicable, it matters not that the new lease is upon different terms from the old one, or for a larger rent, or that the lessor would not have leased to the firm. The law recognizes the renewal of a lease as a reasonable expectancy of the tenants in possession, and in many cases protects this expectancy as a thing of value. I will briefly notice a few of the cases upon this subject. In Holdridge v. Gillespie, 2 Johns. Ch. 30, Chancellor Kent says: 'It is a general principle pervading the cases that if a mortgagee, executor, trustee, tenant for life, etc., who has a limited interest, gets an advantage by being in possession, or "behind the back" of the party interested in the subject, or by some contrivance or fraud, he shall not retain the same for his own benefit, but hold it in trust.'"

In Latta v. Kilbourn, 150 U. S. 541, 14 Sup. Ct. 207, 37 L. Ed. 1169, the court say:

"The general principles on which the court proceeded admit of no question, it being well settled that one partner cannot, directly or indirectly, use partnership assets for his own benefit; that he cannot, in conducting the business of a partnership, take any profit clandestinely for himself; that he cannot carry on the business of the partnership for his private advantage; that he cannot carry on another business in competition or rivalry with that of the firm, thereby depriving it of the benefit of his time, skill, and fidelity, without being accountable to his co-partners for any profit that may accrue to him therefrom; that he cannot be permitted to secure for himself that which it is his duty to obtain, if at all, for the firm of which he is a member; nor can he avail himself of knowledge or information which may be properly regarded as the property of the partnership, in the sense that it is available or useful to the firm for any purpose within the scope of the partnership business."

In the same case, at page 549, 150 U. S., page 211, 14 Sup. Ct., and page 1178, 37 L. Ed., the court say:

"It is well settled that a partner may traffic outside of the scope of the firm's business for his own benefit and advantage, and, without going into the authorities, it is sufficient to cite the thoroughly considered case of Aas v. Benham [1891] 2 Ch. 244, 255, in which it was sought to make one partner accountable for profits realized from another business, on the ground that he availed himself of information obtained by him in the course of his partnership business, or by reason of his connection with the firm, to secure individual advantage in the new enterprise. It was there laid down by Lord Justice Lindley that if a member of a partnership firm avails himself of information obtained by him in the course of the transaction of the partnership business, or by reason of his connection with the firm, for any purpose within the scope of the partnership business, or for any purpose which would compete with the partnership business, he is liable to account to the firm for any benefit he may have obtained from the use of such information, but if he uses the information for purposes which are wholly without the scope of the partnership business, and not competing with it, the firm is not entitled to an account of such benefits."

It is clear in this case that it was the duty, as it had been the promise, of Lee to procure the 70-mile contract for the firm, and this contract was a "reasonable expectancy"; and the fact, if it was a fact, that the construction company would not have given the contract to the firm, does not alter the case or relieve him from his obligations. Mitchell v. Reed, 61 N. Y. 129; Miller v. O'Boyle, supra.

The procurement of the 70-mile contract was clearly within the scope of the partnership of Monroe, Strang, Lee & Co., and infor-

mation of the prospect and offer of this work came to Lee and Monroe while the partnership lasted. Independent of Lee's peculiar and especial trust relation, created by the fact that he had sought and obtained a place as superintendent of the work on the 50-mile contract, and with the distinct agreement with his partners that he would, if possible, get the additional work, his simple relation as a partner made it his duty to earn the good will of the construction company and the public for his firm, and to get any contract for work he could for the firm which was of a character within the scope of the partnership. If he found that the construction company had, for any reasons, good or bad, determined not to contract with his firm because Strang and Williamson were members of it, good faith, common honesty, required of him, if he could, to remove by proper explanations any objections the construction company might entertain to them, and, if he could not, to advise Strang and Williamson so that they might have an opportunity to do so; and, finally, upon their failure to explain or remove the objections, if he could throw off his trust relation to them, and acquire the contract for himself to their exclusion, "he could only do so after the frankest disclosures to the plaintiffs of all the circumstances, and distinct notice of his intention to act in that regard in his own behalf, to the exclusion of the plaintiffs." Miller v. O'Boyle (C. C.) 89 Fed. 142. He failed to do this, and that he did so designedly, secretly, selfishly, and to the injury of the plaintiffs, and with the specific object of getting the 70-mile contract for Monroe and himself, after it was promised to the firm, is morally certain. He not only did not notify them that the work had been offered or promised, but he denied that it had been, and so testifies; while it is shown that on the 10th of March, only three days after he mailed the dissolution notices, he was arranging to have Fergerson bid on parts of the new work, and, the very next day, sending out letters to contractors advising them that the 50-mile contract was let, but they would soon have additional work to let. Every principle here stated is distinctly recognized in Miller v. O'Boyle, supra, and is amply sustained by authority and reason. It is true, upon the authority of that case, plaintiffs might well, at any time after the execution of the 70-mile contract, have applied, by injunctive proceedings, to have declared their rights under the contract, because they had a right to participate in the management of the work; the letting of the sub-contracts; to know, as the work progressed, the cost and expense; to inspect the books; in short, to exercise all the rights of partners. They waived these rights. Their waiver is not a matter of which defendants can complain, and that the defendants were relieved of their assistance and aid is the fault of Monroe and Lee, of which no advantage can now be had by them. As stated in Miller v. O'Boyle, supra, if plaintiffs had instituted injunctive proceedings to have their rights declared as soon as the 70-mile contract was made, no final decree could have been entered until the work under the contract was completed and the business wound up. In Miller v. O'Boyle, Circuit Judge Acheson used this language:

"Now, O'Boyle went to Guadalajara as the representative of the partnership of Miller & O'Boyle, to consummate the municipal sewerage contract. In this matter he was the trusted agent of the plaintiff. If it was open to him at all to throw off his agency, and acquire the contract for himself, he could only do so after the frankest disclosures to the plaintiff of all the circumstances, and distinct notice of his intention to act in his own behalf, to the exclusion of the plaintiff. The observations of Chief Justice Gibson, in Bartholemew v. Leech, 7 Watts, 472, 473, in respect to the incapacity of a confidential agent to acquire title in hostility to his principal, are very pertinent here: 'To capacitate him as a purchaser on his own account, he must have explicitly resigned his trust. The most open, ingenuous, and disinterested dealing is required of a confidential agent while he consents to act as such, and there must be an unambiguous relinquishment of his agency before he can acquire a personal interest in the subject of it. To leave a doubt of his position in this respect is to turn himself into a trustee. It is unnecessary to recur to authority for a principle so familiar or so accordant with common honesty.' O'Boyle's partnership relation to the plaintiff precludes him from holding this contract for his own benefit, or appropriating its advantages to himself and his co-defendant, to the exclusion of the plaintiff."

The principles announced in that case are sustained by Howell v. Harvey, 5 Ark. 271; Mitchell v. Reed, 61 N. Y. 123; Roby v. Colehour, 135 Ill. 338, 25 N. E. 777.

The language quoted from Miller v. O'Boyle, supra, is apposite to the facts in this case. Monroe and Lee held the 70-mile contract in trust for the firm; or, if they cannot be held as trustees, the court, having acquired jurisdiction of the parties and the subject-matter for the settlement of the accounts under the 50-mile contract, will retain the case to assess the damages for the breach of their contract in taking and holding the 70-mile contract in their own name, and the damages should be assessed under the rule laid down in Howell v. Harvey, supra.

Williamson's eight thousand dollar note: It was not contended at the hearing that the Williamson note for $8,000 was negotiable, and it is not. Pars. Notes & B. 30. It was contended that the note was an equitable assignment, of an amount equal to the face of the note and interest, of Williamson's share in the net profits of the contract between the Arkansas Construction Company and Monroe, Strang, Lee & Co., and that as such Creech had the right to treat it and accept it from the Arkansas Construction Company in settlement of that contract. But the contract between Monroe, Strang, Lee & Co. and Creech did not authorize Creech to accept it in settlement, and the position is not tenable. The effect of admitting this contention would be to cut off the right by Williamson to contest with the Missouri, Kansas & Texas Trust Company his liability on the note. It would be, in effect, without his consent to compel him to pay the trust company the $8,000, and then resort to a proper action to compel the trust company to pay any claim he might have against it, and take the chances of insolvency and defeat; and this, too, in an action to which neither the Missouri, Kansas & Texas Trust Company nor its assignee, the Arkansas Construction Company, are parties. Moreover, the instrument itself is not an equitable assignment. Sixkiller v. Rogers (Ark.) 55 S. W. 135; Christmas v. Russell, 14 Wall. 69, 20 L. Ed. 762; Hatch v. Hutchinson, 64 Ark. 119, 40 S. W. 578; Hamilton v. Downer, 152 Ill. 651, 38 N. E. 733. Instead of the in-

strument being an equitable assignment, it was a mere promise to pay the note when a final settlement was made with the construction company. But his obligation to make the payments at that time is a very different thing from that of authorizing Creech to accept this obligation as so much money on account of that contract. Creech was bound by the terms of the instrument under which he was acting, and he had no authority to violate it because out of the proceeds of the settlement Williamson had agreed to pay a note concerning which Creech had nothing to do. The acceptance of the note was therefore unauthorized.

The Strang construction outfit: As to the sale of the Strang construction outfit, the testimony fails to convince the mind of the court that a sale was ever made. There was no inventory of the property ever made, no value fixed upon it, and the court does not think there was ever any delivery. The property was subsequently sold by Strang before it had been determined that the contract with the Arkansas Construction Company would finally result in any profits to Monroe, Strang, Lee & Co. It is true that doubtless the 50-mile contract had been sublet, so that if the subcontractors carried out their contracts it was reasonably certain there would be a net profit; but there were other and varied contingencies before any positive result could be reached in that respect. Neither does the testimony convince the mind of the court that the outfit at any time bore such contract relation to the firm of Monroe, Strang, Lee & Co. as that the latter became entitled to any part of its earnings, or responsible for any part of the expense of maintaining it. It may be, and it is probably true, that the firm profited by the fact that Strang owned the outfit. It may have tended to give the firm standing, and to contribute to the procurement of business. This is disputed, however, and the court is not prepared to say that, if it were vital to the case, Strang's owning the outfit did, in point of fact, contribute in any way to the benefit of the firm. Courts cannot make contracts, and they should not undertake to enforce them unless reasonably certain of their existence. If the court should rest the case upon the testimony of the plaintiffs alone, it is not prepared to say that they would be entitled to the relief sought, but, when taken in the light of the testimony on both sides, the matter is left in so much doubt that the court is of opinion that plaintiffs should not have relief in regard thereto. Strang may have thought he had made a sale, and the circumstances tend to show that he may have suffered losses by reason of his understandings and dealings with the firm, but the evidence falls short of showing a sale or any such contract as ought to be enforced, and upon this issue the plaintiffs must fail.

It is ordered that the case be referred to the Honorable C. B. Moore, the standing master in chancery of this court, with instructions to state an account by and between the plaintiffs and the defendants. In stating the account on the 50-mile contract, he will observe the terms of the written agreement by and between Monroe, Strang, Lee & Co. and the defendant Creech; and in stating the account with reference to the 70-mile contract he will state it upon the basis that each of the partners, Williamson, Monroe, Strang, and Lee, were

equal partners therein, giving to each one-fourth of the net proceeds thereof. Counsel will prepare the decree, and submit it to opposing counsel, and then to the court for its approval, conforming the same to this opinion.